## MAGNOLIA PETROLEUM CO. v. NATIONAL LABOR RELATIONS BOARD.

## MAGNOLIA PRODUCTION AND SHOP DEPARTMENT EMPLOYEES' ASS'N v. SAME.

### Nos. 2056, 2070.

Circuit Court of Appeals, Tenth Circuit.

Nov. 18, 1940.

---

[2] Gordon v. Buster, 113 Tex. 382, 257 S.W. 220, 221.

1008

Ross Madole, of Dallas, Tex., and W. R. Wallace, of Oklahoma City, Okl. (Walace Hawkins, of Dallas, Tex., on the brief), for Magnolia Petroleum Co.

Don Anderson, of Oklahoma City, Okl., for Magnolia Production and Shop Department Employees' Ass'n.

Sylvester Garrett, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Richard C. Barrett, and Malcolm S. Mason, all of Washington, D. C., on the brief), for National Labor Relations Board.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

By these proceedings the Magnolia Petroleum Company, herein called petitioner, seeks to set aside and the National Labor Relations Board, herein called Board, by answer seeks to enforce an order of the Board, finding and adjudging that the petitioner had engaged and was engaging in unfair labor practices affecting commerce within the meaning of Section 8, Subdivision (1) and (2), and Section 2, Subdivision (6) and (7), of the National Labor Relations Act, 29 U.S.C.A. §§ 158 and 152.

Upon charges and amended charges, duly filed by the Oil Workers International Union, Locals Nos. 280 and 378, herein called the Union, the Board issued its complaint dated November 25, 1938, against the petitioner, alleging that the petitioner had engaged and was engaging in unfair labor practices in violation of Section 8, paragraphs (1) and (2) and (3), and Section 2, paragraphs (6) and (7), of the National Labor Relations Act, herein called the Act. The complaint charged the wrongful discharge of one employee and unfair discrimination in the transfer of other employees because they had joined and assisted the Union and had thereby discouraged membership in the Union. The complaint further charged its officers, agents, and persons acting in its behalf with dominating and interfering with the formation and administration of and with contributing to the support of a labor organization in the State of Oklahoma, known as the Magnolia Production Shop and Department Employees' Association, herein called Association, thereby inter-

fering with and restraining its employees in the exercise of the rights guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157.

The petitioner, by its answer, admitted the essential jurisdictional facts but denied any violation of the Act and by way of affirmative defense alleged that the Board and Union were estopped to deny the validity of the Association as a proper bargaining agent of the employees represented, because the Board and the Union had recognized the same as a proper bargaining agent by the approval of, and participation in, a consent election in certain districts in Oklahoma,[1] wherein under the supervision of the Board the employees of the Company were allowed to choose between the Association and the Union as their bargaining agency; that the Board and Union are thereby precluded from attacking the same on the ground that it is, or was, dominated by the petitioner in violation of the Act.

The Association was permitted to intervene in support of its validity as a proper bargaining agency for the employees it represented. After hearing, which began on April 10, 1935, and filing of an intermediate report by the Trial Examiner with the Board, the Board considered the case on the exceptions filed by the petitioner and intervenor. On confirmation of the intermediate report of the Trial Examiner the Board found that the petitioner had not engaged in unfair labor practices within the meaning of Section 8, Sub-division 3, of the Act, which related to the discharge of an employee and the discrimination with respect to hire and tenure of employment and membership in the Union, but found that the petitioner had and was engaging in unfair labor practices within the meaning of Section 8, paragraphs (1) and (2) and Section 2, paragraphs (6) and (7), of the Act and ordered petitioner to desist from interfering, restraining or coercing its employees in the exercise of the right of self-organization, guaranteed under Section 7 of the Act and to withdraw all recognition from the Association as a representative of any of its employees within the state of Oklahoma, except in the two districts wherein elections had been held under the supervision of the Board as hereinbefore related and to post notices as required by the Act, evidencing compliance with the same.

The question raised here portrays the familiar contest of a nationally affiliated labor union to organize and exclusively represent workers which had in the past been represented by an unaffiliated labor organization, sponsored by the employer.

The decision of the Board finds support primarily in a course of conduct followed by the petitioner, originating in the formation of an employee representation organization, prior to the enactment of the National Labor Relations Act and culminating in the formation of the organization known here as the Association. Prior to April 12, 1935, the employees of the Magnolia Petroleum Company were represented in their labor relations with the employer by what was known as the "Plan." This plan embraced representatives of the employees, duly elected from certain geographical districts, in Oklahoma and Texas, which together with representatives of the employer composed an executive, or advisory committee. Under the rules of procedure, stated meetings were held, usually at the office of the employer and the members were paid the expenses incident to travel and attendance at said meeting. It may be fairly stated that this plan did not conform to the requirements of the National Labor Relations Act in its freedom of self-organization and independent bargaining rights.

In the Spring of 1937, the employer and employees realized that the plan could not be continued under the National Labor Relations Act. On May 11, and approximately one month after the Supreme Court of the United States had sustained the constitutionality of the National Labor Relations Act, the President of the petitioner company directed a letter to every employee of the Magnolia Petroleum Company in the State of Oklahoma, by the terms of which he recognized the force and effect of the Act; quoted from its provisions relating to freedom of self-organization, without interference, and stated that the employees were free to organize in any manner and in any way they saw fit, saying: "the employees compose the jury to decide for themselves the kind of organization they wish." The letter appears to represent fairly the spirit and purpose of the National Labor Relations Act, except he did we think, erroneously state that the "plan" was a proper labor organization within the meaning and protection of the Act.

---

[1] Cushing and Graham Districts.

For purposes of policy the company did not thereafter contribute to or in any way support the plan. The evidence shows that the Advisory Committee, of the plan, held no meetings after April 29, 1937.

Thereafter, and until the following October, the employees, as well as the employer, were in a state of confusion concerning the method and manner of employer and employee representation. Several attempts were made to organize the employees. The complaining Union was represented in all of the districts and apparently there was considerable Union activity after abandonment of the Plan. It was conceded, however, that they did not have a majority in any of the districts except one.[2] Certain employees of the company (not members of the Union), three in particular, Matlock, Jackson, and Bruce, took the initiative in drafting a proposed covenant which was to operate as the framework of a new organization and by mailing and contacting the representatives of the old plan, a meeting was called at Dallas, Texas, on October 20, 1937. The meeting was composed primarily of representatives of the old plan, newly elected for the Dallas meeting. The meeting was concluded on October 22, 1937, after those present, representing their respective districts, by election, had agreed upon a covenant, by-laws and rules of procedure for a new organization. It is herein designated as the Association.

The Association retained the old officers of the plan until their successors could be elected and qualified. Indeed, the Association in many respects took the same form as the old plan, except the elimination of certain obviously objectionable features condemned by the Act.[3]

■ There is no evidence that the petitioner contributed financially or sponsored the organization of the Association, except it is plain that the head of the Personnel Department and his Assistant were informed of the progress of the organization at all times and attended a number of the meetings, at the invitation of the officers of the Association, apparently for the purpose of discussing the legal effect and the application of the National Labor Relations Act.[4] It may be fairly inferred from the record that certain supervisory employees of the petitioner called the district and division superintendents, evidenced opposition to the Union and in a subtle guarded manner gave encouragement to the formation and organization of the Association.[5]

---

[2] Cushing District.

[3] The rules of procedure, which were adopted by the executive committee under the covenant contained as endorsement of the Company's "Red Horse Book" one section of which provided that grievances, including "complaints concerning discriminations, discharge and working conditions" should, if not settled between the employees and his immediate supervisor, be appealed to the representative of the plan and if not settled satisfactorily, submitted to arbitration. The arbitrators had no power however to decide the dispute but merely to report their findings to the officers of the company. Final decision rested with the company's board of directors.

[4] The minutes of the Association show that Norrell and Hensley of the personnel department at different times "explained interpretations as handed down by the National Labor Relations Board. The legal aspects of collective bargaining" and "company aspects of collective bargaining."

[5] In the spring of 1937, the employees became dissatisfied with the plan, and, in April or May, 1937, John Terrell, the company's safety director during a speech at a compulsory safety meeting called by the foreman, urged the men to "try the plan a little longer." At a later safety meeting Superintendent Proctor for the Oklahoma Division made a talk on organization and said, "that the Wagner Act had caused the company union to no longer be in force, and he didn't care what anybody joined; they could join anything else they wanted to, * * * 'the Union was all right if they would keep politics out of it * * *.' There is no hurry to join it. You can join it at any time you want to, they will take your $2.00 at any time you want to give it to them. That I never have known of anybody being kept out of the Union." He said "this other organization would do just as much good, and it wouldn't cost near as much." Wright, a foreman, stated to two employees, "I don't think the company likes organized labor, and I believe they are big enough so they won't have to recognize it if they didn't want to." Superintendent Sherman of the Yale district called an employee aside and told him that "the Union was going to ruin everything", and that "I ought to look into things and investigate them before I joined the Union." Sherman asked the employee if he knew the Oil Workers Union was represented by five Russian Jews and when the employee stated that he did not, Sherman displayed a newspaper clip-

In passing upon the question of whether or not the petitioner has dominated and interfered with the formation and administration of the Association and has contributed support to it to such an extent that the Association does not offer to the employees the freedom of representation and collective bargaining guaranteed by the Act, we must accord to the Board the functions of a tribunal charged with the province of weighing the evidence as a trier of fact and if there is any substantial evidence to support its findings we are not warranted in overturning the decision of the Board. Whether the findings and conclusions drawn from the established and conflicting evidence is fairly supported by the record is the province of this court. "When then, as here, the Board applies to this court for enforcement of its order, and there is a substantial challenge of the findings and order as unsupported by evidence, it is the duty of this court to examine the evidence for itself, not, of course, to determine what fact inferences it, acting as a trier, would have drawn, what fact findings it would have made, but to determine whether reasonable minds having no interest as accuser or otherwise in the result but wholly impartial, could, upon the evidence, have legally and fairly drawn the fact inferences, made the fact findings." Magnolia Petroleum Company v. National Labor Relations Board, 5 Cir., 112 F.2d 545, 549.

Courts, charged with the province of review and with the interpretation of the provisions of the Act must give heed to the spirit of those provisions of the Act which guarantee to the employees the right to organize for the purposes of collective bargaining, without interference or molestation from the employer. An independent organization unaffiliated with any national organization is an appropriate bargaining agency within the meaning and protection of the Act, so long as it meets the standards of independence required by the Act.

In other words, the employees of this petitioner have a perfect right to organize such an association as a collective bargaining agency so long as the same meets the requirements of the Act, in freedom of organization and collective bargaining.

The sole question here is does this association meet these requirements. In considering that question we are mindful of the consideration given to organizations having similar background to the one before us. We are prone to scrutinize the events leading up to the organization of the association because it springs from and had its inception in a plan admittedly not in conformity with the Act. We are prone to look askance upon any contribution made by the company to its organization, which might indicate that the employees were not absolutely free and unmolested in the promulgation and adoption of the present plan of collective bargaining. We must be sure that the slate is wiped clean. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S. Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; Continental Oil Co. v. National Labor Relations Board, 10 Cir., 113 F.2d 473; Swift & Company v. National Labor Relations Board, 10 Cir., 106 F.2d 87, 92, 93, 94, 95; National Labor Relations Board v. American Mfg. Co., 2 Cir., 106 F.2d 61, 68; International Association of Machinists v. National Labor Relations Board, 71 App.D.C. 175, 110 F. 2d 29; Republic Steel Corporation v. National Labor Relations Board, 3 Cir., 107 F.2d 472, 476, 477; Union Drawn Steel Co. v. National Labor Relations Board, 3 Cir., 109 F.2d 587, 590, 591; National Labor Relations Board v. J. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984; System Federation No. 40 v. Virginian Ry. Co., D.C., 11 F.Supp. 621, affirmed, 4 Cir., 84 F.2d 641, affirmed 300 U.S. 515, 57 S.Ct. 592, 81 L. Ed. 789. (See 11 F.Supp. page 627.)

In our zeal to protect the employee from employer domination we must not

---

ping that said it "all right * * * and gave their names and said they were at the head of the union." On an occasion after an Oil Workers Union grievance committee had been granted a meeting with Superintendent Proctor to discuss certain transfers of union men, Proctor refused to recognize their spokesman, stating "you are not one of my men and I don't recognize you. You don't work for me and I don't listen to anything you

have to say. I am running my business here and no outsider is going to run it, and when I get to where I can't run it, the company won't. let me be here to run it, so I am not going to listen to you". After an employee had been granted a hearing on his discharge by his supervisor, he requested that he be allowed to have a union representative present and the superintendent replied that he "didn't want no damn representative there."

convict by suspicion, nor permit a judgment to stand based upon suspicion or inference generated by a preference for one organization over another. Neither should we by our judgment directly or indirectly, wittingly or unwittingly encourage employees to select an affiliated or unaffiliated organization to represent them in affecting the purposes of the Act. Zeal to protect must not amount to oppression or preference, and this duty is equally enjoined upon all tribunals charged with the responsibility of fairly and impartially administering the provisions of the Act.

█ The findings and conclusions of the Board must be accorded the same weight as the verdict of a jury under the common law. The Board found that the Association was an outgrowth of the plan, which was clearly inconsistent with the effectual purposes of the Act and that there was evident hostility to the Union by certain supervisory employees of the petitioner manifest by certain statements made by W. F. Sherman, a superintendent, Proctor, the Division Superintendent, and O. K. Wright, a superintendent. The presence of Norrell and Hensley, of the Personnel Department, of the Company, at the organization meeting and the further fact that the covenant of the Association by its rules of procedure adopted the "provisions of the statement of the Industrial Relations policy, published by the Magnolia Petroleum Company on July 1, 1937," which were contained in a book called the "Red Horse Book"; the provisions of which had previously been impressed upon the employees as representing the views of the petitioner with respect to arbitration and grievances and which made the directors of the petitioner the final arbitrators in all matters.

In view of these facts we are unable to say that the inferences drawn by the Board therefrom were erroneous. We can find nothing in the declaration of policy as announced by the President of the petitioner company in his letter of May 11, 1939, contrary to the spirit and purpose of the Act, except as herein noted. Yet, it is apparent from the record that the subtle hand of certain supervisory employees exercised an unwarranted influence in the formation of the Association inconsistent with the neutrality made mandatory by the provisions of the Act.

On the theory that there was a complete disestablishment of the plan, the company contends that this case is controlled by Magnolia Petroleum Company v. National Labor Relations Board, 5 Cir., 112 F.2d 545; Humble Oil & Rfg. Co. v. National Labor Relations Board, 5 Cir., 113 F.2d 85; L. Grief & Bro., Inc. v. National Labor Relations Board, 4 Cir., 108 F.2d 551, and Link-Belt Co. v. National Labor Relations Board, 7 Cir., 110 F.2d 506, 508. It is sufficient to say that in each of these cases the court found that there was a complete break between the two unions and a disestablishment of the objectionable union, and the employees were effectively and unmistakably informed of such action.

In Magnolia Petroleum Company v. National Labor Relations Board, supra, which involves the same company and employees, the company had prior to the act maintained the same "plan" as the one involved here. (The plan included Texas and Oklahoma.) After the plan was condemned a new organization succeeded the plan. Charges were filed alleging that it was company dominated. Whereupon, the company posted notices prepared by a representative of the Board, announcing complete disestablishment and complete withdrawal of recognition of the organization. A third union was organized which the Board also found to be company dominated. The decision of the Board was not upheld. It is clear that the facts are distinguishable.

█ We adhere to the principle that the Act does not compel employees to affiliate themselves with any organization nor does it prevent them from organizing an association comparable to the one here so long as it is truly independent from any domination or interference from the Company. Neither do we mean to say that a true independent organization could not be evolved from one which had been condemned by the Act. Nothing here should be construed to indicate or infer that employees of any company or any employer cannot form their own independent organization under the Act but we are of the opinion that the Board's subsidiary findings of fact sustains its conclusions that the petitioner engaged in unfair labor practices by its relationship to the Association in its formation and by their hostility to the Union they made manifest their illegal interest in the formation of the Association.

█ There is nothing in the Board's supervision of the consent elections in the Cushing and Graham Districts which could operate as an estoppel of its jurisdiction to

inquire into the validity of the Association under the Act, especially when the Board excepts these districts from its order. At most it could only be considered as evidence of the competency of the Association to be considered together with all other facts and circumstances.

The petitions to set aside the Board's order are denied and the order will be enforced.