WAREHOUSEMEN'S UNION, LOCAL 117, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, STABLE-MEN & HELPERS OF AMERICA, AFFILIATED WITH THE AMERICAN FEDERATION OF LABOR v. NATIONAL LABOR RELATIONS BOARD.

NATIONAL LABOR RELATIONS BOARD v. McKESSON & ROBBINS, Inc., et al.

Nos. 7650, 7671.

United States Court of Appeals for the District of Columbia.

Decided May 5, 1941.

Joseph A. Padway and Herbert S. Thatcher, both of Washington, D. C., for petitioner in No. 7650.

Robert B. Watts, Gen. Counsel, and Gerhard Van Arkel, both of Washington, D. C., for respondent in No. 7650 and petitioner in No. 7671.

Clinton Robb, of Washington, D. C., and Frederic Wingersky and A. J. Bronstein, both of Boston, Mass., for respondent in No. 7671.

Before GRONER, Chief Justice, and MILLER and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The parties seek respectively to set aside and to secure enforcement of the Board's order directing McKesson & Robbins, Inc. (McKesson),[1] to desist from unfair labor practices. These consisted in giving effect to a closed-shop agreement, the validity of which is in question. That depends, in turn, upon the effect to be given to a so-called truce agreement, made five months previously in settlement of a controversy between two unions.

The controversy began late in 1936 as a jurisdictional dispute over membership between unions affiliated with the A. F.

---

[1] Abbreviations used in the opinion appear in parentheses when not otherwise indicated.

On December 8, 1938, subsequent to the hearing but before issuance of the Board's order, the United States District Court for the Southern District of New York, upon petition by McKesson for reorganization under Chapter X of the Bankruptcy Act [52 Stat. 840, 11 U.S.C. (Supp. V) § 501, 11 U.S.C.A. § 501 et seq.] issued an order appointing William J. Wardall trustee of the estate and all assets of McKesson and staying all suits and proceedings against it pending final decree in the reorganization proceedings. The Board, in accordance with the mandate of Sections 10, sub. a, and 14 of the Act, 11 U.S.C.A. §§ 28, sub. a, 32, found that the instant proceedings were not affected by the District Court's restraining order. None of the parties questions the Board's ruling in this respect.

of L., Teamsters [2] and Longshoremen. [3] It closed the employer's plants from early January, 1937, until June 14 following. At that time they reopened under the truce agreement which was reached at the instance of a citizens' committee. Shortly, the agreement provided that the men would return to work retaining their then existing union affiliations, and that the dispute would be submitted for settlement to the annual convention of the A. F. of L., to be held in the following October. Both unions agreed to be bound by the convention's decision. When the agreement was made both organizations were affiliated with the A. F. of L., but in August, 1937, pursuant to a referendum previously taken, the Longshoremen withdrew from the A. F. of L. [4] and affiliated with the C. I. O. In September Longshoremen notified the employer that they represented a majority of the employees affected and wished to enter into bargaining negotiations. In October the A. F. of L. convention decided the dispute in favor of Teamsters. Shortly thereafter the employees were notified concerning the decision and informed that they would be expected to comply with it. Late in October Longshoremen filed with the Board a petition stating it had been selected as the collective bargaining representative of a majority of the employees in the two plants involved and asking the Board to certify it as their exclusive representative. On November 15, 1937, McKesson executed the closed-shop contract with Teamsters and put it into effect immediately. It appears to have regarded itself as obligated to take this action by the terms of the truce agreement. Employees who refused to transfer their union affiliations to Teamsters were discharged. One of the plants was closed as a result of picketing by Teamsters in an effort to enforce the closed-shop agreement. Some of its employees who transferred to Teamsters were given employment at the other plant. Employees who refused to transfer were denied such employment. On November 23, the C. I. O. local filed charges of unfair labor practices against McKesson, upon which the Board issued its complaint in July, 1938, and held hearings before a trial examiner in the following September.

In February, 1938, the Board ordered and held an election in the representation proceeding to determine whether Teamsters or the Longshoremen represented a majority of the employees. Only employees who were on the payroll in the week of October 28, 1937, prior to the closed-shop contract, were made eligible to vote. The election resulted in favor of Teamsters by a vote of 32 to 27. The Board took no action upon the regional director's recommendation that Teamsters be certified as exclusive bargaining agent, withholding this pending the outcome of the unfair practice proceeding. This resulted in the decision and order in question here, made in January, 1940.

In brief, the Board found that on November 15, 1937, when the closed-shop contract was made, Teamsters did not represent a majority of the employees. Therefore the contract was invalid and the action taken by the company to give it effect constituted unfair labor practices. It held that the truce agreement was ineffective to create and maintain until November 15 the majority representation which the statute [49 Stat. 452, 29 U.S.C.(Supp. V) § 158 (3), 29 U.S.C.A. § 158(3)] requires to validate a closed-shop contract, and it declined to certify Teamsters as bargaining agent on the strength of the election held in the previous February.

It may be added that the employer is a Maryland corporation, having a large number of wholesale houses in different states,

[2] Teamsters designates Warehousemen's Union, Local 117, International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, affiliated with the American Federation of Labor, when not used to indicate the International Brotherhood. The local union was formed in the fall of 1936.

[3] Weighers, Warehousemen and Cereal Workers Local 38-117, International Longshoremen's Association (I. L. A.), affiliated with the A. F. of L. The local was formed in June, 1935.

[4] Local 38-117 voted late in July to affiliate with the C. I. O. by a majority of approximately four to one. The ballot was taken in a referendum among the local unions of I. L. A. directed by a caucus of its delegates to the convention of the Maritime Federation of the Pacific held in June. Following the referendum International Warehousemen & Longshoremen's Union, affiliated with C. I. O., was established and issued a charter to Local 9, composed of officers and members of Local 38-117 who voted to withdraw from A. F. of L. Whether the withdrawal in legal effect was merely by these persons as individuals or was by the local as a union is in dispute.

each of which is a division having its own warehouse. Two Seattle plants are involved in this case, McKesson-Stewart and McKesson-Blumauer. The company purchased the latter October 1, 1937, and operated it until November 16 following, when it was closed following the putting into effect of the closed-shop contract. Thereafter it conducted its combined Seattle business through the McKesson-Stewart plant, under the name of McKesson & Robbins, Inc., Stewart Holmes and Blumauer Frank Division. The truce agreement applied also to other companies affected by the same controversy between the unions, and McKesson entered into closed-shop contracts with A. F. of L. affiliates with reference to other plants not affected by the truce agreement at about the same time it made the contract with Teamsters involved here.

It is but fair to say that until August, 1937, McKesson stood in the cross fire of battle between contending unions, victim of the struggle rather than combatant. As far as the record shows, it maintained a hands-off policy as long as the fight was confined to the ranks of the A. F. of L., both in the Seattle plants and elsewhere. But late in July, 1937, the Longshoremen's referendum resulted in favor of withdrawing from the A. F. of L. and joining the C. I. O. Almost immediately, in August, McKesson made a general working agreement with the A. F. of L., applicable in its plants throughout the country wherever it could be put into effect without violating the law. It provided for recognition of A. F. of L. affiliates as bargaining representatives and for closed-shop agreements with them wherever they might have a majority of the company's employees. But there was no similar agreement with the C. I. O. applicable in circumstances where its affiliates might have majorities. This, combined with the fact that the agreement with A. F. of L. came so quickly after the Longshoremen's referendum, might be taken to indicate the company's preference as between the two organizations. However this may be, the validity of the closed-shop contract depended not upon the delicacy or even the danger of the company's position nor upon the risks which it ran in signing or refusing to sign it, but upon the existence of the conditions prescribed by the statute for giving such an agreement effect.

The underlying issue is whether the closed-shop contract of November 15, 1937, was valid. The unfair practices which the Board found the company had committed consisted in acts by which the contract was put into effect. If the contract stands, these acts were legal. If it falls, they fall with it—outside the law. Whether the contract was valid depends in turn upon whether the circumstances of its execution complied with the conditions prescribed in Section 8(3) of the Wagner Act.[5] They are that the labor organization with which the agreement is made shall be one which is (1) "not established, maintained, or assisted" by any unfair labor practice; and (2) is the representative of a majority of the employees in the appropriate unit covered by the agreement "when made." International Ass'n of Machinists v. N. L. R. B., 1940, 311 U.S. 72, 61 S.Ct. 83, 85 L. Ed. 50, affirming 1939, 71 App.D.C. 175, 110 F.2d 29, 33.

No question is presented concerning the appropriateness of the unit. Nor is there any as to the freedom of the union from domination by the employer. The only issue is whether Teamsters represented a majority of the employees at the date the contract was made. The Board's finding to the contrary is in question.

Teamsters and McKesson attack it on two grounds. The first finds the existence of the required majority in the effects of the truce agreement. The second, disregarding that agreement, is that the election held by the Board in February, 1938, disclosed that a majority of the employees

---

[5] 49 Stat. 452, 29 U.S.C. (Supp. V) § 158 (3) 29 U.S.C.A. § 158 (3): "It shall be an unfair labor practice for an employer — * * * (3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this chapter, or in sections 701 to 712 of Title 15, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this chapter as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 159 (a) of this title, in the appropriate collective bargaining unit covered by such agreement *when made*." (Italics supplied)

were represented by Teamsters as of the preceding November 15, and that the Board and Longshoremen are bound by the results of that election.

## I. Effect of the Truce Agreement

As the case has been presented, the issue relating to the truce agreement is one concerning its interpretation rather than its validity or the meaning of Section 8 (3). All agree that November 15, 1937, was the date on which were required to exist the statutory conditions for validating the closed-shop contract.[6] Teamsters and Mc-Kesson urge that, since all of the employees affected assented to and "agreed to be bound by" the truce agreement, their consent, though given in June, remained legally effective in November, so that Teamsters was then their bargaining representative, regardless of the fact that a majority in the meantime had changed their affiliation to the C. I. O. and had done all they could to designate it as their representative. This, it is said, fulfilled the requirements of Section 8 (3) and validated the closed-shop contract. The argument assumes that it is sufficient to satisfy the section's requirements that there be on the date of the closed-shop agreement a majority consenting to the representation only by virtue of an antecedent contract.[7] But, if we assume this to be so, the broad contention of Teamsters and McKesson implies: (1) that the truce agreement was a representation agreement; (2) that it designated Teamsters as representative; (3) that in both respects it was in full force and effect on November 15, 1937. It is implicit in this view that the agreement obligated the majority not to change their representative prior to that date.

The Board found, on the contrary, that the agreement contemplated only the settlement of a jurisdictional dispute between two unions affiliated with the A. F. of L., not one between such a union and another affiliated with the C. I. O. As applied to the facts of this case, this view of the agreement places a limitation upon it which renders it ineffective upon withdrawal by one of the contracting unions and consequent affiliation of a majority of the employees with a C. I. O. organization, followed by designation of it as their representative. In effect, it construes the agreement as not binding the employees not to change their representative prior to November 15.

Consideration of the agreement's specific terms, and of the circumstances in which it was executed, is required. It is set forth in full in the margin.[8] Teamsters' and Mc-

---

[6] Neither Teamsters nor McKesson relies upon the truce agreement as being in itself a closed-shop contract. Neither claims, therefore, that June 14, when it was executed, or October 13, when the convention decided in favor of Teamsters, was the crucial date upon which the statutory conditions for validating the closed-shop agreement were required to exist.

[7] Section 8 (3) does not specify the time at which the consent of the majority may be given to the representation. Of course it must be effective when the closed-shop agreement is made. But whether a consent given only for representation and then effective for that purpose, despite attempted revocation by the majority, is also effective to confer upon the representative the power then to compel not only the majority but all employees also to affiliate with it, as a closed-shop agreement requires, is the issue which we leave undetermined. In some circumstances so to construe the section would be in effect to give the representative the power to compel the actually opposing majority to affiliate with the minority. Whether stability in industrial relations requires the effect of a valid representation agreement to be carried so far under the section's

language is left for determination in the future.

[8] "Citizens Committee
"June 9, 1937
"Mr. Hugh Bradshaw, Warehouse Drivers and Helpers, Room 3 Pike Place Market
"Dear Sir: In order that the unfortunate jurisdictional dispute between your respective organizations, which has prostrated for months the Bemis Bag Company, the West Coast Kalsomine Company, and three wholesale drug establishments in our city, depriving the employees of those concerns of work, and ruining the busines [sic] of the industries involved, we desire to make the following proposition as a basis for settlement:
"1. That the industries immediately open their plants under guarantees by both unions that the workers will be permitted to return to work, and the products will be hauled and delivered without interference.
"2. That each employee of these concerns return to work under his or her present union affiliations, and that the ILA will appeal from the decision of the Executive Council of the American Feder-

Kesson's view of it is based primarily upon the idea that it was intended to bring about a final and binding settlement of the controversy. They argue that the contract would give little, if any, assurance of this, if the assenting employees were free to designate another representative at any time upon withdrawal of a majority from affiliation with the A. F. of L. The argument is that not only the contracting unions, but each assenting employee bound himself irrevocably to accept the representative selected by the convention and, therefore, that his consent remained effective on November 15, 1937. The agreement between the unions as such is immaterial, except as it may indicate what was the contract, if any, undertaken by the individual employees. Even upon Teamsters' and McKesson's hypotheses concerning the statute and the truce agreement, the essential condition for validation is the existence on November 15 of legally effective consent to the representation by Teamsters, given by a majority of the individual employees, not by the contending unions. To sustain their position, therefore, they must contend, as they do, that each employee by signing the memorandum which was attached to the contract bound himself not to change the representative prior to November 15. The issue is, therefore, whether the individual employees intended to bind themselves not to designate a representative other than that named by the convention. In effect, under the facts and the specific terms of the agreement, it is whether they intended to contract that they would not change their A. F. of L. affiliation.[9]

Consideration of the truce agreement's terms in light of the circumstances in which it was signed requires that the Board's conclusion be sustained.

The agreement was made between unions affiliated with A. F. of L. It was intended to settle a typical A. F. of L. "jurisdiction-

---

ation of Labor to the October convention of that organization, to be held in Denver, Colorado.

"3. That both organizations agree to be bound by the final decisions of that convention. The pending suit will be dismissed with prejudice as to all parties.

"4. If no appeal is taken by the ILA to the convention, both unions agree to abide by the present decision of the Executive Council.

"5. This agreement shall become effective when signed by the officers of the unions, and the signing of this agreement by the employees shall entitle such employees signing to the same position which he or she held at the time the strike was declared. Such employment to commence as rapidly as work can be provided.
"The Citizens Committee
"(Signed) E. B. Fish"
"June 10, 1937
"To the Citizens Committee and
Mr. E. B. Fish
"We, the undersigned agree to the proposal attached and hereby express our desire for its application by parties concerned.
"(Signed) C. L. Moore, Warehousemen Bemis Bag Co.
"N. E. Braaflat
"Dave Beck by G. F. Vanderveer, Vice President of International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America
"W. L. Glazier, Warehouse Drivers and Helpers Local 117

"Matt Meehan, Matt Mehan Sec. Dist. 38 I. L. A.
"Hugh R. Bradshaw, Hugh R. Bradshaw Business Agent Local 38-117 I. L. A.
"H. B. Bridges, President Pacific Coast Dist. International Longshoremen's Association"

After the agreement was executed on behalf of the various unions, each of McKesson's warehouse employees in the two divisions involved signed the following memorandum which was attached to the agreement:
"The undersigned employees of McKesson-Stewart & Holmes (Blumauer-Frank Drug Co.) fully understanding the within agreement, hereby approve the same and agree to be bound thereby."

[9] While affiliation is distinct from representation in the absence of a closed-shop contract, here all employees were affiliated with A. F. of L. through Teamsters or Longshoremen, and those who broke away to join the C. I. O. designated it as their representative. In such an interunion struggle affiliation carries with it normally, if not always, the right of representation.

Furthermore, the truce agreement was concerned to some extent with affiliation, as shown by the provision that each employee should return to work "under his or her present union affiliations."

al dispute." All of the employees were affiliated with A. F. of L. through one union or the other. There had been talk about the Longshoremen's withdrawing to join C. I. O., but no action had been taken officially toward this end. Nevertheless the possibility that it might occur was not so remote as to be absent from the parties' minds when the agreement was made.

To give the contract the effect for which Teamsters and McKesson contend would produce extraordinary results. First, it would violate all principles of fair arbitration. It would make A. F. of L. judge in its own cause, arbitrator not merely in an internal matter but in a controversy with its strongest rival. Labor unions and their members usually do not submit their disputes to their opponent's arbitrary judgment and decision.

Again, and perhaps with greater significance, such an interpretation would bring the contract squarely into conflict with long-established A. F. of L. policy, both in function and in procedure, if not also with the powers conferred upon it by its constitution. We have had occasion recently to consider and decide important questions concerning the power of A. F. of L. to determine jurisdictional disputes over membership arising between two of its affiliated organizations.[10] We held that it has the power under its constitution and by-laws not only to act as mediator but to settle and determine such questions when mediation fails. One of the convincing reasons we found for this view was the long-settled policy and practice of the parent organization in exercising the power with the acquiescence of its affiliates. Furthermore, the procedure which governs action in such cases is clearly established by the constitution and by-laws and long has been embodied in the organization's practice. Disputes of this character between affiliates are decided between annual conventions by the executive council. Appeal from its decision lies to the convention, which is the final authority. If no appeal is taken, the council's decision is final. There is no provision

for appeal by a nonaffiliated body. Neither in this record nor otherwise have we been informed of any case, other than the present one, in which A. F. of L. has undertaken to determine a dispute over membership between one of its affiliates and a union not affiliated with it. Its constitution and by-laws make no provision for its doing so. The procedure which they prescribe is inappropriate for application to such a controversy. The entire structure of its regulations, both as to function and as to procedure, is framed for the reconciliation and determination of disputes between affiliated bodies, not for performing similar functions for outsiders. The reason for these things is clear. It is that in such cases A. F. of L. would be a partisan, not an impartial arbitrator within its own house. Internally its policy is reconciliation, mediation and, if necessary, decision. Externally it is warfare upon opposing bodies.

Taking account of these facts, the language of the agreement shows clearly that it was intended to apply only to a jurisdictional dispute within the normal and appropriate functioning of A. F. of L. This appears both from its affirmative provisions and from its omissions.

The agreement specifies that its purpose is to settle the "unfortunate jurisdictional dispute between your respective organizations." This is accepted and well-understood parlance of A. F. of L.'s organizational structure and conflict. The jurisdictional dispute is an incident of the craft structure of its unionism. It is not characteristic of other types of organization. The contract provides that each employee shall "return to work under his or her present union affiliations." This is the only reference to individual affiliation. Nothing in the contract specifically requires the employee to retain his existing affiliation or to do so for any definite length of time, though the affiliated unions agree to be bound by the final decision of the convention or of the executive council if no appeal is taken.[11] It is provided that "ILA [Long-

---

[10] Green v. Obergfell, 73 App.D.C. ——, 121 F.2d 46, decided March 17, 1941.

[11] The absence of any provision concerning retention or change of individual affiliation also is entirely consistent with A. F. of L. policy and powers. Teamsters' brief asserts:

"While, as the parent association of its member organizations, it has the right to determine the jurisdiction granted to, or

claimed by, its affiliates so long as they choose to remain associated with the parent organization, it has no power actually to enforce its judgment. It cannot transfer the membership of individual members of one of its affiliated organizations to any other organization. * *, * When the Executive Council or a Convention of the American Federation of Labor decides that a particular union has jurisdiction

shoremen] will appeal from the decision of the Executive Council * * * to the October convention." This clearly contemplates the existence of a right to appeal, which nonaffiliated unions do not have.

These provisions clearly contemplate a dispute between unions affiliated with A. F. of L. The normal procedure for settlement of such disputes is agreed upon. Throughout the contract its affirmative provisions show that it was drawn in detail, as well as in major function, to end a fight strictly within the ranks of A. F. of L. They were entirely inappropriate for settlement of an external conflict.

The omissions are equally significant. There is not one word concerning the contingency of withdrawal either by one of the unions or by individual members and affiliation with C. I. O. or any other nonaffiliated body. This stands out like a sore thumb when it is recalled that there had been considerable discussion that Longshoremen and its members might secede and join C. I. O. In these circumstances if it had been intended to guard against this contingency that purpose could have been made clear beyond quibble by simple addition to the agreement. A matter so vital, whether to the contracting unions or to their members, should not be left to inference or implication in such circumstances. In fact Teamsters did not intend

that it should be left to inference. It seems clear that the discussion concerning the possibility of Longshoremen's secession prompted Dave Beck, vice president of Teamsters, in attempting to have inserted a further and supplemental agreement providing that in event of withdrawal by Longshoremen the employees nonetheless would be bound by the convention's decision and would apply for membership in Teamsters if it should be designated.[12] This strikes at the very heart of the issue. It is said that the proposed addition was nothing more than a clarifying amendment. But we think it was more than that. As has been pointed out, the only provision of the contract itself concerning individual affiliation was that the men would go back to work under their then existing union affiliations. It said nothing about retaining them. By the memorandum which they signed the individual employees approved and agreed to be bound by "the within agreement." Even if that obligated them to change their affiliations from one A. F. of L. union to another, should the convention require this, it presupposed their being members of A. F. of L. at the time of the decision. It nowhere purported to bind them *not to join the* C. I. O. in the meantime or after the decision. The introductory language of the proposed addition is, *"Supplementing the foregoing*

over a certain class of employees, it is customary that the union which was found not to have jurisdiction over such class of employees would transfer its members in such class to the union having jurisdiction. This * * * is not mandatory in the sense that the American Federation of Labor has power to compel such transfer."

[12] The proposed supplemental agreement was as follows: "Supplementing the foregoing agreement, we do hereby agree that if the International Longshoremen's Association shall sever its connection with the American Federation of Labor, we will nevertheless obey the jurisdictional decision of the American Federation of Labor and if the decision of the Executive Council is not reversed, we will immediately *make application for membership in the* Teamsters' Union."

Throughout the negotiations Beck showed a strong disinclination to sign the truce. He finally agreed to do so if it was approved by his attorney and was first signed by Harry Bridges, president of Longshoremen's International. The attorney approved it, after slight modification, and Bridges' signature was obtained.

At the time all the signatures of the officers of the unions were on the agreement except Beck's. He still did not wish to sign it. However, his name finally was added by his attorney, it is claimed on the express condition that the supplemental agreement should be included. It is not shown that the other signatories agreed to this, and it is clear that the supplemental agreement never was submitted to the individual employees of McKesson, though it was contained in several agreements covering plants of other employers which were made at about the same time.

There is evidence that the failure to comply with Beck's condition for inclusion of the supplemental agreement was accidental. But, accepting this, the effect could not be to obligate the employees to an agreement which they did not see or sign. The question would be raised rather whether the contract ever became effective as to Teamsters, whether in other words there was ever a meeting of minds. But this question merely has been suggested, not insisted upon. We therefore assume that the agreement became binding upon all, to whatever extent its terms may have gone.

agreement." (Italics supplied) It refers specifically to the possible contingency that Longshoremen might secede. It provides that in this event the individual employees will remain with A. F. of L. and affiliate with Teamsters if the council's decision should not be reversed. This was addition, not merely clarification. It "supplemented" the "foregoing agreement," as it was intended to do. Beck insisted upon having the addition made. He made this a condition of his signature. He saw to it also that the addition was made in other similar agreements, affecting plants of other employers, entered into at the same time. His view evidently, and therefore Teamsters', was that the truce agreement with the men was not intended to and did not bind the individual employees to remain with A. F. of L. or not to change their affiliations or their representative. It may be noted also that an earlier proposal which made a similar provision for transfer of members was flatly rejected. 5 N.L.R.B.(1938) 70, 76, n. 3.

Finally, the agreement fails to provide how long it is to be effective, if it is regarded as applicable outside the structure of A. F. of L. It specifies no definite term, whether in months or in years. If it was intended to be applicable only to disputes within A. F. of L. there was no need for a time limitation. As among its affiliates and their members, the convention's decision would settle the matter once and for all. But as between an affiliate and an outside organization, and their members, since no time limit was prescribed for giving effect to the representation following the convention's decision, the question would arise whether the agreement was effective indefinitely, or for a reasonable period of time, or was terminable at will. It is not necessary to determine which of these possibilities might be applicable. We refer to the omission because it supports the view that the contract was intended to apply only when A. F. of L. affiliates were in conflict. Had the intention been otherwise, the chance would not have been taken that the contract might be terminated at will and the fruit of victory lost immediately after the convention's decision.

■ In view of these considerations, we think the Board's construction of the agreement must stand. It is one thing to contract to be bound by the decisions of the final authority in an organization as long as one remains affiliated with it. It is another to agree to remain in affiliation, whether for an indefinite or a limited time. The employees here made no such agreement as the latter. They consented to the terms of the contract made by the contending unions. It did not purport to bind the unions as such not to change affiliation. But even if it had done this, that would be very different from binding the individual members likewise to retain affiliation. In the facts of this case affiliation and representation went hand in hand. Nothing in the agreement bound the individual employees not to change their representative in case they should change their affiliation to a union outside the jurisdiction of A. F. of L. We find therefore that the truce agreement was not legally effective to make Teamsters the representative of the majority of the employees on November 15, 1937.

## II.   The Representation Proceeding and Election

■ Teamsters and McKesson say that, regardless of the truce agreement, the election which the Board held in February, 1938, showed conclusively that Teamsters represented a majority of the employees on the preceding November 15; and that the circumstances and manner of holding the election constituted a bar to further proceedings on the unfair practice charges.

The argument in effect asserts that ordering and holding the election in the representation proceeding concluded all issues relating to unfair practices, notwithstanding the fact that the Board suspended action on certification pending outcome of the unfair practice proceeding. In effect, though not so denominated, it sets up a plea of res judicata against the hearing on the unfair practices charges. It is based on the view that the Board had before it, when it ordered and held the election, the same issue and substantially the same evidence as were presented in the unfair practice proceeding. To support this it is pointed out that the Board held that the closed-shop contract and the circumstances under which it was put into effect constituted no bar to an election, and further that it restricted the voting to employees who were on the pay roll during the week of October 28, prior to the making of the contract. It is also noted that the unfair practice charges had been filed during the preceding November, though in this connection it should be recalled that complaint

was not issued on them until the following July.

The argument derives color from the fact that the basic question in both the representation and the unfair practice proceedings was identical, namely, whether Teamsters was the representative of a majority of the employees on November 15. But it is only colorable; it misconceives the effect of the Board's action in ordering and holding the election and its powers in relation to both proceedings. It also ignores important facts. It assumes that the Board was bound conclusively by the result of the election, in other words that this obligated it to certify Teamsters.[13] This assumes either that the unfair practices, if they existed, could not have affected the election and that it reflected the free choice of the employees on November 15, though it was not held until three months later; or, in the alternative, that no unfair practices existed. These are the very questions at issue. But the argument goes further and also assumes that the order for the election decided the very issue which the election was to decide. The contention that the order conclusively determined that there had been no unfair practices is but another way of saying that it determined that Teamsters was the representative of the majority on November 15. If this was the effect of the order, holding the election was a useless rigmarole.

A less logistic answer is that both the fact and the manner of ordering the election indicate that the Board suspected that unfair practices existed. In holding that the closed-shop contract and its execution were not a bar to an election, the Board was not finding either that unfair practices had existed or that they had not existed. In other words, it was not determining the validity of the agreement or, therefore, the fact that Teamsters was or was not the majority's representative on November 15. It was providing a method by which these interdependent questions could be determined. The order for the election therefore had none of the effect of res judicata

or, what amounts to the same thing, of estoppel against the Board on the question of unfair practices.

Nor did the fact that the election was held and resulted in favor of Teamsters. Normally the result of an election would be certification, but that is not always true. An election is merely one of of the methods by which the Board may determine the question of representation. It may, in representation proceedings, as it did in this case on the same issue in the unfair practice proceeding, resort to other methods to determine that question. 29 U.S.C. (Supp.V) § 159, 29 U.S.C.A. § 159; N. L. R. B. v. Falk Corp., 1940, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396. Furthermore, and of greater importance, the result of an election is not always conclusive on the Board as to certification. It may disregard the results of an election, at any rate prior to certification if not also afterward, as it may those of any other method of ascertaining the majority, when it appears in proper proceedings that it has been affected by unfair practices.[14] Teamsters points out that it is an accepted procedure of the Board to postpone elections until charges of unfair practice are decided. It does not contend that, generally speaking, the Board has no power to do this. But it complains of the alleged departure from that practice in this case, not because the Board had no power to make it, but because before the representation proceeding was concluded the Board, on discovering that charges of unfair practice had been made, decided to revert to its normal practice. In other words, the position is that once an election is ordered and held, but before certification in accordance with its result is made, nothing which can occur between the two events can justify withholding certification.

Teamsters and McKesson, however, claim that the Board had full knowledge concerning the closed-shop agreement and the unfair practices when it ordered and held the election. They argue from this that nothing new came to the attention of

---

[13] In effect the argument asks us to order the Board to certify Teamsters on the strength of the election. It is questionable, at least, whether such a jurisdiction exists in this court. N. L. R. B. v. Falk Corp., 1940, 308 U.S. 453, 459, 60 S.Ct. 307, 84 L.Ed. 396.

[14] Cf. International Ass'n of Machinists v. N. L. R. B., 1940, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50, affirming 1939, 71

App.D.C. 175, 110 F.2d 29, 33; N. L. R. B. v. Bradford Dyeing Ass'n, 1940, 310 U. S. 318, 339–340, 60 S.Ct. 918, 84 L.Ed. 1226; N. L. R. B. v. Falk Corp., 1940, 308 U.S. 453, 461, 60 S.Ct. 307, 84 L. Ed. 396; N. L. R. B. v. Highland Park Mfg. Co., 4 Cir., 1940, 110 F.2d 632, 640; Texas & N. O. R. R. v. Brotherhood of Ry. Clerks, 1930, 281 U.S. 548, 569, 50 S.Ct. 427, 74 L.Ed. 1034.

the Board after the election in either the representation or the unfair practice proceeding. The Board asserts, on the contrary, that it had not been informed when it directed an election that charges of unfair practice had been filed. Unless in its quasi-judicial capacity it is to be charged with judicial notice of the contents of all charges which are in its files awaiting decision as to whether a complaint shall be issued, this statement must be accepted as true. Again it may be recalled that though the charges of unfair practice were filed in November complaint upon them was not issued until the following July. It would be going a long way to hold that application of the principles of judicial notice in such circumstances, combined with the holding of an election in a representation proceeding, should bar the Board from going forward with the unfair practice charges or, what would amount to the same thing in this case, should require it to certify as representative the union which is successful in the election regardless of the pendency of the charges. It is true that the Board knew of the existence of the closed-shop agreement and that it had been put into effect, but that is not the same thing as having knowledge of the pendency of the unfair practice charges. It may be that the Board's failure to discover this prior to the election was inadvertent, but we do not think that is sufficient reason for making the election conclusive and a bar to consideration of the unfair practice charges.

██ Generally representation and unfair practice proceedings are distinct, both in issues and in the relief sought.[15] Procedure and evidence also differ. But they may and often do overlap. Representation may be involved and determined in unfair practice proceedings [29 U.S.C. (Supp. V) § 159(c), § 9(c) of the Wagner Act] and unfair practices may affect representation. Rarely does a single issue, as here, underlie and conclude both proceedings. When it does the very identity of the issue makes especially appropriate application of the Board's discretion, conferred by Section 9(c), to conjoin the representation and the unfair practice proceed-

ings. Nothing in the section specifies the time at which the conjunction must take place or limits the Board's power to making it prior to an order for an election or any other step short of final decision in the representation proceeding. Ordering and holding an election are but steps in the investigation. They merely furnish one of the methods by which the Board may determine the issue of representation. In a sense, therefore, they are only evidentiary, not conclusive final acts of decision. Withholding certification pending final action on the charges of unfair practice is in effect, if not in form, a conjunction of the proceedings as authorized by Section 9(c). It affords opportunity to dispose of the entire controversy in all its phases and with respect to all of the forms of relief authorized by the statute. We think it clear that the Board had full power to withhold its decision on certification pending the outcome of the unfair practice proceeding. It follows that it was not bound to give effect to the result of the election and that its action in ordering and holding it was not a bar to going forward on the charges of unfair practice.[16] It may be added in support of this conclusion that even if the evidence, as well as the ultimate issue, in the two proceedings turned out to be substantially identical, that fact could not be known in advance of the hearing on unfair practices.

### III.

It remains to consider whether there was substantial evidence to sustain the Board's findings concerning the existence of unfair practices or, to state it in another form, whether there was such evidence to sustain its finding that Teamsters was not the representative of a majority of the employees on November 15, 1937.

Teamsters and McKesson say that the February election concluded this question, particularly since the voting list was confined to employees as of the week of October 28. The argument assumes that the election was not affected by the unfair practices, that it therefore represented the free choice of the employees as of November 15, though it was held more than three months later when the closed-shop

---

15 Cf. A. F. of L. v. N. L. R. B., 1940, 308 U.S. 401, 405, 409, 60 S.Ct. 300, 84 L.Ed. 347.

16 In Magnolia Petroleum Co. v. N. L. R. B., 10 Cir., 1940, 115 F.2d 1007, it was held that supervision of a consent election to determine which of two unions was to represent the employees did not estop the Board from questioning thereafter the validity of one of the unions as bargaining representative.

contract had been put into effect by the combined efforts of Teamsters and the employer. It assumes that antedating the election was sufficient to overcome the effects of putting the contract into force. That may be true so far as the eligible voting list included employees who had been discharged and were not reemployed prior to the election. But it does not follow that the employees who retained their positions by transferring affiliation from Longshoremen to Teamsters after the closed-shop agreement went into effect were not influenced by it in their voting. The record shows that although a majority refused to join Teamsters upon the opening of the plant after the closed-shop agreement was made many did so within a few days afterward. It seems clear that these changes were not or may not have been the result of a free choice, but were made in order to comply with a condition of employment.[17] At any rate, it was clearly open to the Board in these circumstances to find that the results of the compulsion from putting the contract into force had not been dissipated when the election was held.

■■■ Furthermore, on the basis of membership lists which showed that at least 44 of the 59 warehouse employees of McKesson were members of Longshoremen as of November 15, substantiated by evidence that the list contained only names of members in good standing as of that date and evidence, which was hardly disputed, that the majority of the employees refused to affiliate immediately with Teamsters when the plant was opened after the contract was put into effect, the Board found that Teamsters did not represent a majority as of that date. The evidence is clearly sufficient to sustain the finding and it is therefore conclusive upon us.

■■■ In one respect the order of the Board should be modified. Paragraph 1(d) requires McKesson to "cease and desist from * * * in any other manner interfering with, restraining, or coercing its employees in the exercise of their rights * * * guaranteed in Section 7 of the National Labor Relations Act." In the circumstances of this case we think this paragraph should be stricken. The only unfair practices here resulted from the making and enforcement of the closed-shop agreement. In view of the doubtful effect of the truce agreement regarded as of November 15, and the evident difficulties under which the employer was laboring in the struggle with the contending unions, we think a provision like Paragraph 1(d) inappropriate for application in this case. The record does not clearly show that the employer consciously entered into the closed-shop contract with knowledge of its invalidity, and all of the unfair practices resulted from this single act. Had the contract been valid they would have been legal acts. We think therefore that elimination of the provision will be in accord with the spirit of the decision in N. L. R. B. v. Express Publishing Co., March 3, 1941, 61 S.Ct. 693, 85 L.Ed. ——. Paragraph 2(b) also must be modified, in view of Republic Steel Corp. v. N. L. R. B., 1940, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6, by striking the language: "and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work-relief projects."

Paragraph 1(d) must be stricken and Paragraph 2(b) modified as we have indicated. As thus modified, the Board's order must be enforced.

It is so ordered.

GRONER, C. J. (dissenting).

I regret I am unable to agree with the majority in this case. The affirmance of the Board's order, as I see it, is, 1st, in effect to designate a representative of the employees, contrary to their expressed preference; 2nd, to penalize the employer for living up to a voluntary written agreement between itself and two disputing unions. The facts are fully stated in the opinion. I shall repeat only so much as I believe necessary to make clear the reasons of my dissent.

The controversy originally involved three parties, the Longshoremen's Union, the Teamsters' Union, and the employer. Both unions were then affiliates of the American Federation of Labor. The Longshoremen were first on the ground, and in 1936, after plant shut-downs caused by labor disputes, the employer agreed

---

[17] Cf. N. L. R. B. v. Bradford Dyeing Ass'n, 1940, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; N. L. R. B. v. Falk Corp., 1940, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396.

with them upon a statement of policies governing labor relations. Within a few days, the Teamsters, who claimed the right to represent the men, began to picket, and the plants were again closed. They remained closed with great loss to the companies and the communities, and six months later and after the rejection of various proposals looking to the resumption of work, a written agreement was made at the instance of a citizens' committee, providing that the plants reopen under guaranties by both unions that the workers return to work under their then union affiliation; that the jurisdictional issue be submitted for decision to the General Convention of the American Federation of Labor, and that both unions abide the final decision. There is uncontradicted evidence that the owner of the plants expended a large sum of money to reopen and that it would not have done so except with the understanding that the agreement finally settled the dispute. After it had been signed by all parties, including the individual employees, and prior to the meeting of the Federation of Labor, the Local of the Longshoremen, to which many of the employees belonged, withdrew from the Federation and joined the Congress of Industrial Organizations and notified the employer that it represented a majority of the employees. But it gave no notice of an intention to withdraw from the truce agreement or of a purpose not to continue to be bound by its terms. Thereafter the American Federation convention decided the jurisdictional issue in favor of Teamsters, and within two weeks that union, relying upon the agreement that the decision should settle which of the unions should be recognized, insisted upon a closed shop contract. And the employer, acting in accordance with its undertaking to deal with the union certified by the Federation, signed the contract. Some of its employees who refused to join the Teamsters were then discharged. The Longshoremen's Union, claiming that its severance from the Federation abrogated the agreement, then filed a petition with the Board claiming to represent a majority of employees and asking that it be so designated and that the contract with the Teamsters be abrogated as an unfair labor practice. The Board, for some reason that does not appear, failed to act on the charge of illegality in the making of the contract, but ordered an election to determine which of the two disputants had a majority of the men employed in the plants and made eligible to vote in the election only those who were on the companies' payrolls in the week prior to the decision of the Federation. The result was that 32 of the men voted in favor of Teamsters and 27 in favor of Longshoremen. The Board's Regional Director, properly I think, recommended that the Teamsters be certified as exclusive bargaining agents. The Board, however, refused to certify, and some five months later issued a complaint against the employer on the original charges; and, after new hearings, entered an order finding that the employer had violated the Act in signing the closed shop agreement and discharging some of the men, and directed the employer to withdraw its recognition of Teamsters and to reinstate the discharged employees. The Board, it is true, did not require the employer to pay the men for the time between their discharge and the date of the order, but declined to do so on the ground that when the contract with Teamsters was made the legal rights and obligations of the parties under the agreement were involved in doubt "and the respondent's [employer] course of action with regard to the persons discriminated against appears to have been predicated upon an honest reliance on what it conceived to be the proper interpretation of the Truce Agreement", as indeed it was. The Board, however, directed that the pay of the discharged men commence five days after its decision and that the employer desist from unfair labor practices. The Teamsters appealed, and the present affirmance will require the employer to pay to each of the discharged men unearned wages for approximately a year and a half.

I understand that the purpose of the National Labor Relations Act is to insure to employees an opportunity for a free determination of the union to represent them in their relations with the employer. The certain method of ascertaining the preference is a fair and untrammeled election. Putting to one side, therefore, the question whether in the present instance all the parties were bound by the so-called truce agreement on the jurisdictional question, as in good faith they undoubtedly were, I am nevertheless of opinion that the Board, in ordering and holding an election and then repudiating the result, has acted arbitrarily.

1. The election was ordered with the full knowledge on the part of the Board

that the employer, acting under the binding conditions of the truce agreement, had signed the closed shop contract with the Teamsters.

2. It was obviously its purpose to determine which of the unions represented the majority of the men.

3. There was neither charge nor evidence of coercion of the electorate on the part of the employer.

4. The persons eligible to vote were designated by the Board.

5. The election was conducted by the Board, and the employer took no part in it.

6. No one claims it was not fairly held and the result fairly determined.

7. The Board was then as fully informed of all the charges on which it subsequently acted as it was when it later repudiated its own action and set aside and annulled the election.

In the circumstances, I am wholly unable to find any justification for its course, and I am even more unable to find justification for its further action in ordering the employer not to recognize Teamsters as the bargaining representative "of any" of its employees when the only evidence in hand showed that union as the choice not only of many but of an established majority.

The case as we have it does not present the usual question of conflicting evidence. It is not one in which the Board has placed its own interpretation upon the evidence and thereby bound the courts to adopt its conclusions. It presents, as I think, rather the question whether the procedure adopted by the Board was a fair exercise of its powers under the Act. Because I am convinced that (1) in refusing to give effect to a binding agreement to which all parties assented, (2) in holding an election and without rhyme or reason ignoring its results, and (3) in denying to Teamsters the right of representation of "any" of its members,—the Board unlawfully exercised its powers, I think the order appealed from should be set aside and the case remanded to the Board and—solely because of the lapse of time—the Board should order a new election. For the crucial question, after all, is which of the unions now represents a majority of the men, and constraint by the Board no more than constraint by the employer should enter into the determination of that question.