NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ARROW SPECIALTIES, INC., Respondent.

No. 20382.

United States Court of Appeals, Eighth Circuit.

Jan. 25, 1971.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Abigail Cooley Baskir, James P. Hendricks, Attys., N.L.R.B., Washington, D. C., for petitioner.

Thomas M. Hanna, St. Louis, Mo., for respondent; McMahon & Berger, St. Louis, Mo., of counsel.

Before MEHAFFY and HEANEY, Circuit Judges, and MEREDITH, District Judge.

HEANEY, Circuit Judge.

The National Labor Relations Board petitions this Court for enforcement of an order issued against Arrow Specialties, Inc. The Board found that Arrow violated §§ 8(a) (1), (2) and (5) of the National Labor Relations Act, 29 U.S.C. § 151, et seq. The Board ordered Arrow to bargain with the Union and to post appropriate notices. The Board's decision and order are reported at 177 N.L.R.B. No. 92, 72 L.R.R.M. 1025 (1969).

The record shows that District No. 9, International Association of Machinists and Aerospace Workers, AFL–CIO, initiated an organizing campaign of the Arrow Plant in March of 1968. The Company responded by interrogating employees with respect to Union activities, making various promises and threats to employees, and sponsoring the formation of an employees' committee to discuss grievances with the company.

By May 16th, the Union had received signed authorization cards from twelve employees. On that date, the Union requested recognition and indicated its willingness to submit to a card check by a neutral third party. Arrow expressed doubt about the Union's majority.

On May 21, the Union filed charges with the National Labor Relations Board alleging violations of §§ 8(a) (1), (2) and (5) of the Act. The company filed a petition for a representation election about the same date.

On July 3, the Board issued a complaint based on the Union's charges.

On August 26, Arrow entered into a settlement agreement under which it agreed to post a notice assuring the employees that it would not interfere with their rights under § 7 of the Act [1] or attempt to bargain with the employees directly or through an employee committee. As a part of the settlement agreement, the Regional Director of the Board withdrew the § 8(a) (5) charge, and the Union and Arrow stipulated for certification on a consent election.

Arrow posted the required notice and the settlement agreement, but simultane-

[1]. The notice read:
"WE WILL NOT do anything that interferes with these rights. You are free to join or not to join District No. 9, International Association of Machinists and Aerospace Workers, AFL–CIO.
"WE WILL NOT ask you anything about your or your fellow employees' union activities and feelings.
"WE WILL NOT threaten to take away any benefit you now have if you choose a union to represent you.
"WE WILL NOT give any benefits to you in order to influence your feelings about a union. However, we are not required to take away benefits we have already given you.
"WE WILL NOT tell you to work elsewhere if you want a union or condition pay raises on your not signing an authorization card or get mad at you because you went to union meetings.
"WE WILL NOT suggest that you bargain directly with the company rather than through a union or direct or encourage you to form a committee to bargain with us and we will withdraw our recognition of the employee committee."

ously posted its own notice.[2] Both notices remained posted for thirty days.

On October 1, the Regional Director indefinitely postponed the election. On October 2, the Union filed a new charge reviving its allegation of Arrow's refusal to bargain and charging Arrow with interference and coercion subsequent to the settlement agreement. On October 3, the Regional Director withdrew his approval of the settlement agreement and vacated it on the grounds that he had received evidence showing that Arrow had violated the settlement agreement. He issued a complaint consolidating the old charges with the new ones. The consolidated complaint was subsequently amended to include further § 8(a) (1) allegations.

On October 30, the Union went on strike.

The Board found:

" * * * that [Arrow] violated Section 8(a) (1) of the Act by coercively interrogating its employees concerning their Union membership and activities; creating the impression of surveillance; soliciting employees to withdraw Union authorization cards; and promising and granting benefits, as well as threatening reprisals, in order to discourage Union adherence. The Board found that [Arrow's] fostering the formation of the Employee Committee was violative of Section 8(a) (2) and (1) of the Act. In addition, the board found that [Arrow] violated Section 8(a) (5) and (1) of the Act. Further, the Board found that [Arrow's] post-settlement conduct in violation of Section 8(a) (1) of the Act and the posting of its side notice constituted a violation of the Settlement Agreement, and accordingly, that the Regional Director was justified in setting aside the agreement.

"The Board ordered [Arrow] to cease and desist from the unfair labor practices found and from in any other manner interfering with, restraining, and coercing employees in the exercise of the rights guaranteed by Section 7 of the Act. Affirmatively, the Board directed the Company to bargain, upon request, with the Union as the lawfully designated representative of a majority of the employees in an appropriate unit, and to post the appropriate notices."

Arrow, while not conceding that it committed unfair labor practices prior to the execution of the settlement agree-

2. The notice, addressed "TO OUR EMPLOYEES," read as follows:

"Almost 4 months ago, we asked the N.L.R.B. to hold an election here. Up until now, the Machinists Union blocked your chance to vote by charges of unfair labor practices it filed against this Company. If those charges had been successful, you would *never* have had a chance to vote.

"Because we always felt you have the right to vote and should not be deprived of it, the charges against this Company have been settled. That is the reason for the 'notice' posted here on the bulletin board. As you can see, it does nothing more than tell you what your rights are; namely, to decide for *yourself* whether or *not* to join the Union.

"The 'notice' was agreed to by this Company *only* so you can vote. There is no indication that this Company has done anything wrong. The 'settlement agreement,' which was a part of the 'notice,' is posted immediately below and you can see what it means for yourself.

"A secret ballot election will be held here on October 4. No one will know how you vote. Whether you signed a card or not, you will have complete freedom to vote no. If you have not signed a card, there is no reason to do so since there *definitely* will be an election.

"If *anyone* tries to get you to sign a card or to vote for the union by threats of losing your job or other 'punishment,' which threats we know have been made to some of you, don't believe such statements. They are unlawful and should be reported to the N.L.R.B. As you know, we can't answer any questions you may have about the union. We do intend to let you know how we feel about it in the next few weeks and particularly why we feel you don't need a union here." (Emphasis included.)

ment and while arguing that the violations, if any, were minor, does not question the sufficiency of the evidence to support the Board's findings. It rather argues (1) that the Union did not represent a majority of the employees in an appropriate unit as of a relevant date, (2) that Arrow did not violate the act by posting its own notice simultaneously with that prepared by the Board and that it committed no unfair practices subsequent to the posting of the notices, and (3) that the character of the unfair labor practices, if there were any, did not justify the issuance of a bargaining order.

(1) *The Union's majority in an appropriate unit on a relevant date.*

The Board found that on May 17, the Union had valid authorization cards from twelve of twenty unit employees. Arrow contends that the unit should have included one additional employee, William Hof, excluded by the Board because he was a student. Arrow further contends that Virgil Burkett revoked his authorization card on August 25, and that Isaac Perryman's card was secured by misrepresentations and was subsequently revoked. Thus, it argues the unit consisted of twenty-one employees with the Union representing only ten of them.

We need not determine whether Hof was properly included in the unit or whether Burkett's alleged revocation was effective because we hold that Perryman's card was not secured by misrepresentation and was not effectively revoked. Thus, at a minimum, the Union had eleven cards in a unit of twenty-one employees.

Perryman testified that he was given an authorization card by a Union adherent who said to him, "Let's get a union in here. We will have better insurance and better working conditions;" that the wife of a fellow employee told him that "if we could get enough cards signed, we could get the union in there;" that he signed a card after the second conversation; that employee Burkett told him,

before he signed the card, that "he and I might just as well go along with [the Union]. * * * If the union comes in we wouldn't be allowed to work in a union shop unless we went along with them;" and that he never notified the Union that he was withdrawing his authorization.

■ No objection is made to the form of the authorization card; thus, employee Perryman was bound by the authorization card signed by him unless he was clearly misled by one acting on behalf of the Union as to the purpose of the card. N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 608, n. 27, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We find no evidence in this record to support Arrow's view that misrepresentations were made by a Union representative. On the contrary, the Union solicitor's language was totally free from false or misleading statements. We cannot attribute Burkett's remarks to the Union. He was neither the solicitor of the card nor an agent of the Union. Even if we could, the remark can be interpreted only as a statement of Burkett's belief that, if the Union came in, there would be a Union shop and employees would be required to join the Union. Such a remark would not violate the Act. See, N.L.R.B. v. Karp Metal Products Co., Inc., 134 F.2d 954 (2nd Cir. 1943).

■ Arrow argues that May 17th is not a relevant date because of the lapse of time between that date and the date of the post-settlement agreement unfair practices. It contends that there could have been an increase of employees or a resignation of card signers in the intervening period. The short answer to this contention is that the record does not show an increase in the number of employees between the two dates and the two alleged defections from the Union were related to the employer's unfair labor practices. A union is not required to maintain a continuing majority in the face of continuing unfair labor practices. If this were not the case, an employer could profit by its own miscon-

duct. See, N.L.R.B. v. Ozark Motor Lines, 403 F.2d 356, 359–360 (8th Cir. 1968).

**■** *The alleged unfair labor practices.*

**■** Substantial evidence on the record as a whole supports the Board's finding that Arrow committed numerous and serious unfair labor practices prior to May 21. Arrow interrogated four employees on five occasions with respect to Union activities; it told one employee that overtime would be out if the Union were successful; it granted one employee, Burkett, a wage increase after he assured one of the officers of the company that he did not sign a card; it caused an employee committee to be organized after it learned of the Machinists' organizational campaign and indicated its support of this committee; it granted numerous employee requests for improvements in working conditions; and it gave employees the impression that they were under surveillance.

Finally, the record as a whole supports the Board's finding that Arrow violated § 8(a) (1) of the Act after the settlement agreement was posted. Arrow warned employees that they would lose overtime if the Union won the election; it interrogated employees with respect to Union activities; it promised a Union adherent a promotion on the implicit condition that he would work and vote against the Union; and it encouraged an employee to induce other employees to revoke their authorization cards, implying that if they did so, the employer would be free to grant wage increases.

**■** The unfair labor practices occurring after the settlement agreement were sufficient in and of themselves to justify the Board in setting aside the settlement agreement. As observed by the Supreme Court,

"[The Board] has consistently gone behind [settlement] agreements * * * where subsequent events have demonstrated that efforts at adjustment have failed to accomplish their purpose, or where there has been a subsequent unfair labor practice. We think this rule adopted by the Board is appropriate to accomplish the Act's purpose with fairness to all concerned."

Wallace Corp. v. National Lab. Rel. Bd., 323 U.S. 248, 254–255, 65 S.Ct. 238, 241, 89 L.Ed. 216 (1944).

This language has been interpreted to mean that a settlement agreement can be set aside and presettlement violations found if there has been a breach of an agreement or a subsequent independent violation of the Act by a party to the agreement. N.L.R.B. v. Southeastern Stages, Inc., 423 F.2d 878 (5th Cir. 1970).

In light of the unfair labor practices committed by the employer subsequent to the posting of the settlement agreement, it is unnecessary for us to determine whether Arrow's posting of its own notice simultaneously with that of the Board was a sufficient independent ground for vacating the settlement agreement.[3]

**(3)** *The appropriateness of the bargaining order.*

**■** A bargaining order was clearly proper here. The unfair labor practices were of a serious and continuing nature. They were clearly designed to undermine the Union's majority status and they had that effect. See, N.L.R.B. v. Gerbes Super Markets, Inc., 436 F.2d 19 (8th Cir. Jan. 18, 1971); N.L.R.B. v. Noll Motors, Inc., 433 F.2d 853 (8th Cir. Nov. 4, 1970); Hy-Vee Food Stores, Inc. v. N.L.R.B., 426 F.2d 763 (8th Cir. 1970); N.L.R.B. v. Crystal Tire Co., 410 F.2d 916 (8th Cir. 1969). Compare, Fremont

---

3. For a case in which simultaneous posting of a notice was found by the Board to be sufficient cause for setting aside a settlement agreement, see, News-Texan, Inc. v. N. L. R. B., 422 F.2d 381 (5th Cir. 1970). Compare, N. L. R. B. v. Bangor Plastics, Inc., 392 F.2d 772 (6th Cir. 1967); National Labor Rel. Bd. v. Teamsters and Chauffeurs Union, 241 F.2d 428 (7th Cir. 1957).

Newspapers, Inc. v. N.L.R.B., 436 F.2d 665 (8th Cir. Dec. 22, 1970).

We have examined Arrow's other contentions and find them to be without merit. We enforce the Board's order.