GULF STATES MANUFACTURERS, INC., Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.

No. 77–2406.

United States Court of Appeals, Fifth Circuit.

July 10, 1979.

---

Fay, J., concurred specially in an opinion in which Gee, J., joined.

Charles Clark, J., concurred specially in part and dissented in part with an opinion.

Vance, J., dissented with an opinion in which Alvin B. Rubin, J., joined.

James F. Smith, Gary R. Kessler, Atlanta, Ga., for petitioner, cross-respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, Carol A. DeDeo, Marion Griffin, Jesse I. Etelson, Attys., N.L.R.B., Washington, D.C., for respondent, cross-petitioner.

Petition for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board.

Before BROWN, Chief Judge, and COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.*

GODBOLD, Circuit Judge:

In this case the National Labor Relations Board included in a complaint against an employer unfair labor practice charges that the charging union had withdrawn by

---

* Judge Kravitch was not a member of the Court when this case was heard en banc and, therefore, did not participate in this decision.

agreement with the employer but later had refiled. In the ensuing case the Board found that the employer had committed some of the unfair practices. A panel of this court held that the union could not reallege or reinstate the charges it had withdrawn by agreement and that the Board could not include the realleged charges in the complaint.[1] The court en banc concludes that the Board should not have made the realleged charges the subject of findings of unfair labor practices.

The union received a majority in a Board election conducted in September 1975. The employer filed objections to the election. The union then filed unfair practice charges. Before matters proceeded much further, on or about November 7, 1975, the union and the employer entered into a written stipulation set out in the margin.[2] Un-

1. *Gulf States Manufacturers, Inc. v. NLRB,* 579 F.2d 1298 (CA5, 1978).

2.

"United States of America
Before the National Labor Relations Board
Region Twenty-Six

| | |
|---|---|
| Gulf States Manufacturing, Inc., Employer, | |
| and | Case Nos. |
| International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL CIO, Petitioner and Charging Party (Union) | 26 RC 5064 26 CA 5786 26 CA 5812 |

STIPULATION

In consideration of the mutual covenants, the undersigned, by and through their attorneys or other authorized representatives do hereby stipulate as follows:

1. The Employer agrees to withdraw with prejudice its Objections to the Election and Exceptions to the Regional Director's Report on Objections in Case No. 26–RC-5064; and

2. The Union, in consideration of the Employer's agreement to withdraw its Objections to the Election, agrees to withdraw with prejudice its unfair labor practice charges in Cases Nos. 26 CA 5786 and 26 CA 5812; and

3. There are no other pending Objections to the Election held in Case No. 26 RC 5064 on September 12, 1975; and

4. There are no other unfair labor practice charges pending against the Employer by the Union; and

5. The Union represents that it has been authorized by affected employees in Charge No. 26 CA 5786 and Charge No. 26 CA 5812 to enter into this Stipulation; and

6. The Parties agree that Certification of Representative should issue forthwith and that good faith negotiations shall commence thereafter at mutually convenient dates, times and places; and

7. The Parties hereby agree that this Stipulation shall also constitute a joint request to the Regional Director, Region 26, for withdrawal of the Objections to the Election and all pending unfair labor practice charges and that such withdrawals shall be with prejudice.

International Brotherhood
of Boilermakers, Iron Ship
Builders, Blacksmiths, Forgers
and Helpers, AFL CIO

Curtis Orman   11 7 75

Gulf States Manufacturing, Inc.
Scott P. Watson   11/5/75"

der its terms, the employer agreed to withdraw with prejudice its pending objections to the election, (¶s 1 and 7) and the union agreed to withdraw with prejudice its pending unfair practice charges (¶s 2 and 7). The parties agreed that the union would be certified forthwith as bargaining agent and good faith bargaining should commence (¶ 6). The stipulation served as a joint request to the Regional Director for withdrawal of the objections and charges "and that such withdrawals be with prejudice." (¶ 7).

The stipulation was filed with the Regional Director. He wrote the parties on November 11, 1975, saying:

This is to advise that I have approved the Withdrawal Requests submitted in this matter.

The same day he certified the union.

The charges withdrawn by the union had alleged that beginning in late August 1975 the employer had laid off employees because of union membership, unilaterally changed terms and conditions of employment, made various coercive statements, and had blamed a wage freeze on the union.[3] The employer's objection to the election which was withdrawn charged that secrecy of the ballot was not maintained during the election.

Bargaining commenced November 21. In February 1976 it broke down, and the union went on strike for a week beginning February 14. On February 17 the union filed the unfair practice charges that began the present case, consisting of reallegation of some of the withdrawn charges plus a new charge of failure to bargain in good faith. Negotiations resumed and broke down again. The union amended the charges several times thereafter. The Board issued a complaint in April and amended it in July to consolidate all of the union's charges including those that had been withdrawn and realleged.

Before the ALJ the employer moved to dismiss from the complaint the realleged charges on the grounds they were time-barred by the six months' statute of limitations in § 10(b) of the Act, and that the Regional Director abused his discretion in including them in the complaint when amended in July. The ALJ denied the time-bar on the ground that the February charges had been filed within six months of the occurrence of the withdrawn matters and were sufficiently related to the withdrawn charges that the withdrawn charges could be deemed filed with the February charges. The ALJ found also that the Regional Director did not abuse his discretion by including the withdrawn charges in the amended complaint.

The ALJ went on to find that the employer had committed various 8(a)(1) and 8(a)(3) pre-stipulation violations that had been included in the withdrawn charges and also various violations that had occurred after bargaining broke down in February, including failure to bargain in good faith.

The Board adopted the ALJ's findings of fact and affirmed his conclusions of law. The employer appealed, and the Board cross-appealed for enforcement. A panel of this court, in a two-to-one decision, found the employer had not failed to bargain in good faith and denied enforcement except for post-strike 8(a)(1)'s. The panel found that the union could not "reinstate" the charges because it had withdrawn them with prejudice, and also, since the employer had relied to its detriment on the union's promise, the union was estopped from "reinstating" the charges. With respect to the Board, the court found that the Board was "legally and morally bound" by the withdrawal agreement because, through the Regional Director, it approved the agreement and, pursuant to it, certified the union; this, the court held, "made the Board a party to the agreement." 579 F.2d at 1307.

■ We granted the petition of the Board for rehearing en banc because of our concern with the holdings concerning the effect of the agreement to withdraw

---

3. These charges are described in full at 579 F.2d 1301–02.

charges and the Board's treatment of the charges withdrawn and realleged.[4] The court en banc does not disagree with the conclusion of the panel that the employer did not fail or refuse to bargain in good faith and with the conclusion that the employer committed post-strike 8(a)(1)'s. We agree with the Board, however, that Supervisor Perrigan's statement to employee Parker, that the lack of a wage increase was due to union activity, occurred in January 1976, after the stipulation was made, and, therefore, was not within the withdrawn charges, and we agree that this violated § 8(a)(1). We cannot tell from the record whether Perrigan's statement to employee Harris concerning wage increases occurred before or after the stipulation—the testimony merely says it occurred in November. This portion of the case must be remanded to the Board for further factual development.

The court holds that the Board did not abuse its discretion in permitting the union to reassert the withdrawn charges or in issuing a complaint that included the withdrawn charges. It did, however, abuse its discretion in making the withdrawn and reasserted charges the subject of findings of unfair labor practices. Because of our conclusion it is not necessary that we explore the factually complex issue of the application of the statute of limitations to the various charges and numerous reallegations of charges.[5]

In considering whether the Board should have found the employer guilty of the withdrawn charges, we keep in mind two broad considerations: the integral role that requests to withdraw charges play in the adjustment of labor disputes in our country and the Board's role as an exponent of public interests rather than private rights. For the fiscal year 1977, approximately one-third of all unfair practice charges filed with the Board were disposed of by a Regional Director's approval of withdrawal requests made by parties before complaints were issued.[6] It is apparent that withdrawal of charges is a favored means of settling labor disputes by unions, employers and the Board.[7] The Board considers voluntary adjustments of labor disputes an essential method of implementing national labor policy.[8]

The procedures adopted by the Board for handling unfair practice charges reflect its policy of encouraging voluntary settlement of labor disputes. When charges are filed in the Regional Director's office the charging party is requested "to submit promptly evidence in its support." 29 C.F.R. § 101.4. The person against whom the charges are filed is given an opportunity to respond. A field staff member investigates the charges. If after investigation the Regional Director concludes that there is no basis for the charges he recommends that they be withdrawn. *Id.* § 101.5. If the complainant accepts the recommendation the charges are withdrawn; if he rejects the recommen-

---

4. For two reasons we conclude that the stipulation intended to withdraw all unfair practice charges that the union might have had as of November 11. First, it provides that in addition to the two sets of charges specifically withdrawn, "[t]here are no other unfair labor practice charges pending against the Employer by the Union." Second, under the "related charges" rule, the Board could have issued a complaint including all of the alleged unfair labor practices occurring up to November 11, though not explicitly charged in the union's filings. *See generally Steve's Sash & Door Co. v. NLRB*, 401 F.2d 676 (CA5, 1968).

5. Nor do we reach the issue whether the Board is required to follow, and whether it did follow,

the procedures for handling withdrawn charges, provided in § 10120.5 of its Case Handling Manual.

6. Forty-second Ann.Rep. of the NLRB 5 (1977).

7. *See* Memorandum 79–41 from General Counsel to Regional Directors, *reprinted in* 4 Lab.L. Rep. (CCH) ⁋ 9164 (Aug. 11, 1978).

8. *Id. See also Wallace Corp. v. NLRB*, 323 U.S. 248, 253- 54 & n.8, 65 S.Ct. 238, 240–41 & n.8, 89 L.Ed. 216, 226 & n.8 (1944).

dation, the Regional Director dismisses the charges. *Id.* § 101.6.[9]

If, as in this case, the Regional Director concludes that the charges can be substantiated, the parties are given an opportunity to settle the case before a complaint is issued. *Id.* § 101.7. Only when attempts at informal adjustments have failed may a complaint issue. *Id.* § 101.8; *see NLRB v. Local 264 Laborers' International Union,* 529 F.2d 778 (CA8, 1976). After the issuance of a complaint the Board favors formal settlements, which often include the Board's entering an order. *See generally NLRB v. Oil, Chemical & Atomic Workers International Union,* 476 F.2d 1031 (CA1, 1973); *Leeds & Northrup Co. v. NLRB,* 357 F.2d 527 (CA3, 1966). This is discussed further *infra.*

The Board acts in the public interest to enforce public, not private rights. *National Licorice Co. v. NLRB,* 309 U.S. 350, 364–65, 60 S.Ct. 569, 577–78, 84 L.Ed. 799, 810–11 (1940); *Amalgamated Utility Workers v. Consolidated Edison Co.,* 309 U.S. 261, 265–66, 60 S.Ct. 561, 563–64, 84 L.Ed. 738, 742 (1940); *Agwilines, Inc. v. NLRB,* 87 F.2d 146, 150–51 (CA5, 1936). Section 10(a) of the Act explicitly provides that the Board's power to prevent unfair labor practices "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise . . . ." Accordingly, the "parties cannot by contractual agreement divest the Board's function to operate in the public interest." *Boire v. Int'l Brotherhood of Teamsters,* 479 F.2d 778, 803 (CA5, 1973).

Requests to withdraw charges filed with the Board may arise, and be dealt with, in varying contexts. There may be a unilateral request by the complainant for withdrawal of charges, 29 C.F.R. § 101.5, which may or may not be part of a settlement between the parties, and, if there is a settlement agreement, it is not necessarily revealed to the Regional Director. The Regional Director's consent to the unilateral

request for withdrawal is required, *NLRB v. Wemyss,* 212 F.2d 465, 468 (CA9, 1954); 29 C.F.R. § 102.9, which is consistent with the duty of the Board to enforce public rights rather than private rights. *See Garner v. Teamsters, Chauffeurs & Helpers, Local Union 776,* 346 U.S. 485, 492, 74 S.Ct. 161, 166, 98 L.Ed. 228, 240 (1953). For example, a private party might conclude that it is in his best interest to withdraw a charge; the Regional Director, however, could conclude that the public interest would be better served by a formal resolution of the dispute.

The parties may submit to the Regional Director a proposed settlement of differences between them, and if he concludes that the settlement adequately remedies the violations of the Act, he approves it. This informal settlement procedure is covered by 29 C.F.R. § 101.7. "Proof of compliance is obtained by the regional director before the case is closed. If the respondent fails to perform his obligations under the informal agreement, the regional director may determine to institute formal proceedings." *Id.*

There also may be a formalized agency-approved settlement agreement under 29 C.F.R. § 101.9, in which there is even greater participation by the Board in the adjustment of the labor dispute. Such a settlement must be approved by the Board and provides that "the parties agree to waive their right to [a] hearing and agree further that the Board may issue an order requiring the respondent to take action appropriate to the terms of the settlement." 29 C.F.R. § 101.9(b)(1). The settlement usually contains the respondent's consent "to the Board's application for the entry of a decree by the appropriate circuit court of appeals enforcing the Board's order." *Id.* If a court order is entered the respondent may be held in contempt for failure to comply with the terms of the settlement agreement. *Id.* at § 101.9(e)(1). The settlement operates in the nature of a consent order,

---

**9.** The complainant has a right to appeal a dismissal to the general counsel in Washington, D. C. 29 C.F.R. § 101.71.

entered with the public interest in mind and in general has the effect of a judgment.

The action of the parties in this case and the response of the Regional Director do not fit precisely into any of the foregoing possibilities. The agreement between employer and union was not a private deal, off in limbo and unrelated to the Board. It bears no substantial resemblance to the unilateral withdrawal of charges contemplated by § 101.5. The agreement, the joint request for withdrawal with prejudice and the Regional Director's response; taken together, were something less than a § 101.7 informal settlement agreement but closer to that than anything else. They do not resemble at all a § 101.9 formal settlement.

On receipt of the stipulation the Regional Director might have told the parties to proceed with a § 101.7 informal settlement. An agreement of this type was drafted by an investigator in the Regional Director's Office but never executed. Or he could have declined to permit withdrawal of objections and charges so long as the stipulation provided that the withdrawals would be "with prejudice"; the parties then could have accepted his proposal, or renegotiated, or called off the withdrawals and let the three cases proceed. The Regional Director did none of these, however. Without stating any reservation to his approval—in fact, without reference to the "with prejudice" terms of the agreement—he notified the parties that he approved the "Withdrawal Requests."

■ We turn then to consider the legal standards that should govern Board action in the circumstances that we have described. The panel found that the Board was estopped. But traditional notions of estoppel do not apply to the Board. *Wallace Corp. v. NLRB*, 323 U.S. 248, 253, 65 S.Ct. 238, 240, 89 L.Ed. 216, 226 (1945). "The Board has power to fashion its procedure to achieve the Act's purpose to protect employees from unfair labor practices. We cannot, by incorporating the judicial concept of estoppel into its procedure, render the Board powerless to prevent an obvious frustration of the Act's purposes." *Id.*

In *Wallace* the Court allowed the Board to set aside a formal settlement agreement because the purpose of the settlement had failed and Board action was needed to prevent frustration of the Act. The Court went on to approve the standard used by the Board for deciding when to go behind a formal settlement:

> [The Board] ordinarily will respect the terms of a settlement agreement approved by it. It has consistently gone behind such agreements, however, where subsequent events have demonstrated that efforts at adjustment have failed to accomplish their purpose, or where there has been a subsequent unfair labor practice.

*Id.* at 254, 65 S.Ct. at 241, 89 L.Ed. at 226 (footnotes omitted). Since *Wallace* the courts have consistently allowed the Board to disregard formal settlements when the test laid out in *Wallace* has been met. *NLRB v. International Union of Operating Engineers*, 460 F.2d 589, 597 (CA5, 1972); *NLRB v. Local 269, International Brotherhood of Electrical Workers*, 357 F.2d 51, 56 (CA3, 1966). The courts have applied the same test to determine when the Board may go behind an informal settlement agreement. *NLRB v. Arrow Specialties, Inc.*, 437 F.2d 522, 526 (CA8, 1971); *NLRB v. Southeastern Stages, Inc.*, 423 F.2d 878, 880 (CA5, 1970); *NLRB v. Bangor Plastics, Inc.*, 392 F.2d 772, 775–76 (CA6, 1967); *Lincoln Bearing Co. v. NLRB*, 311 F.2d 48, 50 (CA6, 1962). Although the courts have not articulated reasons for applying the *Wallace* standards to informal settlements, the result reached in those cases is firmly anchored in the national policy of settling labor disputes by voluntary agreement. Some certainty that a settlement agreement will indeed settle the dispute of the parties is needed to encourage voluntary settlement. At the same time the *Wallace* standards give the assurance that informal settlement agreements cannot be used to impede the Board's implementation of the Act. We are guided by the same policy concerns in choosing the standard to be used in this case to review the Regional Director's actions.

We conclude that the *Wallace* standards should be applied. The joint request for withdrawal was part of an overall voluntary settlement of the labor dispute. The entire agreement between the parties was before the Regional Director. He knew the plenary nature of the agreement and knew that the parties had agreed that each of their withdrawals of charges was with prejudice. The agreement was entirely consistent with national labor policy—lay aside differences over the election and the past unfair practice charges, get the union certified and in place, and get the parties to the bargaining table.[10] The Regional Director also knew that the agreement could not be effective unless he approved the joint request for withdrawal. Where such a request is only part of an overall settlement and the Regional Director agrees to the withdrawal, some assurance is necessary that his approval and resulting settlement of the withdrawn charges cannot be set aside merely because one of the parties has brought new charges. The *Wallace* standards effectively provide the necessary assurance while leaving the Regional Director free to act if it turns out that the policies of the Act have been frustrated.

The case principally relied upon by Judge Vance in his dissent, *NLRB v. Zimnox Coal Co.*, 336 F.2d 516 (CA6, 1964), holds that the Board has broad discretion to go behind a withdrawal request. Broad discretion does not mean unreviewable discretion. The standards approved in *Wallace* are appropriate for determining whether the Regional Director misused his discretion in this instance.[11] Nor will our decision impede the Board's procedures for handling unfair labor practice charges and for permitting withdrawals. It does not relate to simple unilateral requests for withdrawal, and the Regional Director retains his discretion to withhold his approval of requests for withdrawals with prejudice.

■ We now know that the first prong of *Wallace* has no application here. The agreement did not fail in its purpose. Turning to the second prong, the mere occurrence of *some* unfair labor practice after withdrawal of the charges had been approved was not enough to permit the Board to find the employer guilty of them when realleged. To construe the holding in *Wallace* so broadly would defeat the policies undergirding voluntary adjustment of industrial disputes. Rather the Board must consider the relationships between the subsequent unfair practices and the agreement and its purposes.

■ *Wallace* and the cases following it involve situations where the subsequent unfair practice charges breached or defeated the settlement agreement. In *Wallace* the Court stated that "[t]he settlement agreement plainly implied that the old employees could return to their jobs with the company simply by becoming members of whichever union would win the election. Nevertheless the company entered into an agreement with Independent which inevitably resulted in bringing about the discharge of a large bloc of C.I.O. men and their president." 323 U.S. at 252, 65 S.Ct. at 240, 89 L.Ed. at 225. The Court concluded that entering into a union shop agreement was an unfair labor practice on the facts before it. *Id.* at 255, 65 S.Ct. at 241, 89 L.Ed. at 227. The subsequent unfair practice defeated the settlement agreement. Similarly in *NLRB v. Southeastern Stages, Inc., supra*, although this court stated that a subsequent unfair labor practice is grounds for setting aside a settlement agreement, without limiting the type of unfair practice, the court went on to say that "[a] settlement agreement may be set aside where, as here, a showing is made that the agreement terms have been breached." *Id.* at 880.[12] A final example is

10. If it turned out that the agreement frustrated national labor policy, the Regional Director, as the exponent of national labor policy, would have, under *Wallace*, the discretion to disregard the agreement.

11. In fact, the *Zimnox* court cited *Wallace* as support for its conclusion that permission to refile withdrawn charges lies in the discretion of the Regional Director.

12. The *Southeastern Stages* court correctly rejected the argument that a settlement agree-

*NLRB v. Arrow Specialties, Inc., supra.* The Eighth Circuit found that a settlement agreement in which the company promised not to interfere with employees' § 7 rights could be set aside because the company subsequently interrogated employees in violation of 8(a)(1), a clear breach of the terms of the settlement agreement. 437 F.2d at 526.

This case demonstrates the unfortunate effect that would be created by a mechanical rule that *any* post-agreement unfair practice permits the Board to find an employer guilty of charges withdrawn with approval and later resurrected. The purposes of the November stipulation were achieved. The election was made effective and the union certified and bargaining occurred. The employer discharged the obligation, imposed upon it by the statute and the agreement, to bargain in good faith. The post-stipulation unfair practices occurred in March [13] and involved interrogation of replacement workers who had been employed as a result of the February strike concerning their union activity, threats of loss of job if they joined the union, and orders to report any union solicitation. The board held these were 8(a)(1) violations, this court granted enforcement of this portion of the Board's order, and the court en banc agrees. But these unfair practice charges did not violate the company's promise to bargain in good faith nor did they substantially frustrate, interfere with or impede it. These unrelated occurrences, taking place considerably after good faith bargaining had begun and after a strike, could not appropriately be the basis for disregarding what had been agreed upon, what had been approved, and what had been achieved. To disregard these things stands on its head the policy of voluntary adjustment of disputes. The incentives for voluntary disposi-

tion of industrial disputes, and for bargaining without the necessity of a Board order, are substantially eroded if the occurrences in this case are burdened with an implied condition that the Board may disregard what has occurred if either party commits any unfair labor practice in the future. Implementation of voluntary adjustment of disputes is especially significant when the disputes center around an election and the agreement is to lay aside the disputes, get the union certified and get on with bargaining. Obviously the situation here would be different if the employer had failed to carry out its duty, and agreement, to bargain in good faith or the subsequent unfair practices had hindered implementation of the agreement.

■ It is obvious that a mechanical rule would have the advantage of simplicity. Judge Vance would allow the Regional Director unreviewable discretion to permit charges to be reasserted and to be the subject of unfair practice findings. At the other end of the spectrum, Judge Fay would not permit the charges to be reasserted at all. The middle course adopted by the court en banc permits the charges to be reasserted and included in a complaint and to be the subject of unfair practice findings if "subsequent events [that is, post-withdrawal] have demonstrated that efforts at adjustment have failed to accomplish their purpose, or . . . there has been a subsequent unfair labor practice." *Wallace*, 323 U.S. at 254, 65 S.Ct. at 241, 89 L.Ed. at 226. Here the "subsequent events" were determined at the complaint hearing. Those events, measured by what we consider correct standards, reveal that the employer had neither breached the agreement by refusing to bargain in good faith nor frustrated nor impeded it nor committed

---

ment may be set aside only where "the violator has breached its terms by engaging in the same type of conduct as covered by the agreement." 423 F.2d at 880. It need not be the same type of conduct but need only impede or frustrate the implementation of the agreement.

**13.** Except for the Perrigan-Parker conversation in January. Although that conversation in-

volved a supervisor's blaming the union for a lack of wage increases, a topic of the negotiations, the possibility is very remote that this single occurrence could have hindered the negotiations then going on. The same is true of the November conversation between Perrigan and Harris, if it is not barred by the stipulation.

any subsequent unfair labor practice having any substantial relationship to it. These circumstances mandated that resurrection of the charges previously withdrawn was not justified and they then dropped out of the case.[14]

As parts of the opinion of the en banc court we adopt Parts II, III and IV of the panel opinion. The Board's order is ENFORCED in part, DENIED in part, and the case is REMANDED to the Board for further proceedings with respect to whether the Perrigan-Harris conversation was barred by the stipulation.

FAY, Circuit Judge, with whom GEE, Circuit Judge, joins, concurring specially:

While agreeing with the result reached by the en banc opinion, which agrees with the panel's conclusion for the most part, I respectfully disagree with the reasoning and basis announced therein. I continue to feel that Part I, The Withdrawn Charges Issue,[1] of the panel opinion is a sounder and more accurate approach to the particular factual circumstance presented.

CHARLES CLARK, Circuit Judge, concurring specially in part and dissenting in part:

I fully agree with Judge Vance that the Board is not bound by the parties' private settlement agreement and is therefore free to entertain "new and timely charges concerning the same conduct." His analysis, however, stops short of considering whether the union's refiling of the withdrawn charges in this case was "timely" under the six-month limitation period of § 10(b). The route taken by the majority eased it of the burden of exploring "the factually complex issue of the application of the statute of limitations to the various charges and numerous reallegations of charges." The contrary conclusion, however, requires a determination of whether the date of refiling complies with § 10(b).

The union's November 11, 1975, withdrawal had the effect of removing from the Board all charges then pending for the employer's alleged anti-union activities to that date. Thus, in order for a pre-November 11 activity to be the subject of the Board's present complaint against Gulf States, it must have been resubmitted to the Board by a new union charge within six months of its occurrence. On February 17, 1976, the union filed its first post-settlement charge with the Board. In addition to listing several general allegations of anti-union activities occurring after the November stipulation, it alleged only an October 1, 1975, unlawful transfer of Johnny Oswalt. This reassertion of a withdrawn charge was clearly made within the permissible period of § 10(b), qualifying it as an appropriate subject of the Board's subsequent complaint. On March 19, 1976, the union amended its February 17 charge to repeat a pre-stipulation general allegation of unlawful interrogation and solicitation of employees on September 15–17, 1975, and added a timely charge of post-settlement refusal to bargain. A second amended complaint filed April 20, 1976, restated these two paragraphs and added another timely charge that a February 16, 1976, unilateral wage increase was improper. The charge of unlawful interrogation and solicitation of employees occurring between September 15 and September 17 was not submitted to the Board within six months of occurrence. Then on July 2, 1976, the union amended its charges once more. It repeated some of the earlier activities but added a paragraph, quoted directly from the original September 17, 1975, charge, alleging the unlawful layoff of thirteen named employees since September 15, 1975. These layoffs all occurred between September 15 and September 17, 1975, and were not put before the Board by the union until July 2, 1976, long after the statute of limitations had run.

---

14. The events subject to the stipulation were not barred from being used as evidence tending to prove unfair labor practices not subject to the stipulation. *NLRB v. Southeastern Stages,* *Inc., supra* at 880 & n.2; *Steve's Sash & Door Co. v. NLRB, supra* at 678.

1. 579 F.2d 1301–09.

This is not the usual § 10(b) case. The union and Gulf States were not dealing at arms length. They had at one point composed their differences in a settlement agreement under which the union withdrew charges and Gulf States forewent its objections to election and agreed to bargain with the union. When the Board included in its complaint specific charges which the union chose not to reactivate within the § 10(b) period, it ignored the settlement agreement by which Gulf States prejudiced its position. This circumstance of prejudice makes inapposite normal rules which permit the Board to include in its complaint other charges which are substantially related to those timely filed by the union. *Cf. Texas Industries, Inc. v. N. L. R. B.*, 336 F.2d 128, 132 (5th Cir. 1964).

All charges filed with the Board here were submitted on the Board's printed form—Charge Against Employer—which leaves a blank space for the specific facts underlying the charge, followed by the printed statement: "By the above and other acts, the above-named employer has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act." If this "boiler plate" may be read to justify a Board complaint based on activities not sufficiently related to those specified in the form to be covered by operation of law, it would become so vast a catchall that it would drain the meaning from § 10(b).

This court has previously recognized that the purpose of the § 10(b) limitation is "to prevent persons from being brought to book on stale charges and to promote industrial stability by allowing parties after the time prescribed as reasonable to assess with certainty their liability for past conduct." *N. L. R. B. v. Auto Warehousers, Inc.*, 571 F.2d 860 (5th Cir. 1978). *See also, N. L. R. B. v. Zimnox Coal Co.*, 336 F.2d 516 (6th Cir. 1964); *N. L. R. B. v. Pennwoven*, 194 F.2d 521, 525 n. 2 (3d Cir. 1952). Any attempt by the union to reassert charges now long stale is doubly prejudicial to Gulf States' defense preparation because of the union's voluntary withdrawal of charges for liability predating November 11, 1975. While the private withdrawal did not restrict the Board in basing a subsequent complaint on the same activities, it is not a license to ignore § 10(b).

Although I concur in Judge Vance's dissent, I would find that in this case those charges not filed within six months of their occurrence are time-barred under § 10(b). Thus, I would agree with the result reached by the majority in denying enforcement to the portions of the Board's order based on the time-barred charges and would limit enforcement to those portions of the order based on the timely charges.

VANCE, Circuit Judge, with whom ALVIN B. RUBIN, Circuit Judge, joins, dissenting:

Initial consideration of the majority's opinion invites the conclusion that a desirable result has been reached. The union [1] agreed to a private settlement with the employer,[2] and under the majority's view of the facts the union is simply held to the bargain. A great deal more, however, is involved. To reach its result the majority does violence to well-established law, and its holding has an unnecessarily disruptive effect on the regulatory apparatus. The price is too high, and I must respectfully dissent.

I.

At issue is whether the National Labor Relations Board can be foreclosed from the discharge of its statutory responsibility by a private agreement which it does not approve and to which it is not a party.

The majority acknowledges that the Board acts in the public interest to enforce

---

1. The International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL CIO.

2. Petitioner, cross-respondent, Gulf States Manufacturers, Inc. (Gulf States).

public, not private rights [3] and that by contractual agreement parties cannot affect the Board's power to prevent unfair labor practices.[4] In my view, however, the effect of its decision is exactly the contrary.

At the outset the majority misconceives the nature of the disposition of the union's original charge. As an outgrowth of this initial error, an incorrect standard is applied, and an incorrect result ultimately ensues. The correct characterization of the disposition is important not only because it is outcome determinative in this case but also because, as precedent, the majority's holding will influence disposition of tens of thousands of cases. Over half of the disputes handled by the Board are disposed of voluntarily, but voluntary disposition can occur in several ways with different consequences.

The majority likens the November 7, 1975, settlement stipulation between the union and Gulf States to an informal agreement contemplated by 29 C.F.R. § 101.7. It then compares that type of agreement with the formal agreement provided for in 29 C.F.R. § 101.9, concluding that the same principles govern consideration of preagreement violations in either case. The stipulation, however, was neither type of agreement. It was a private stipulation resulting in the withdrawal of charges on complainant's own initiative as authorized by 29 C.F.R. § 101.5.[5]

The § 101.9 formal agreement ordinarily [6] requires approval of the Board in Washington. The § 101.7 informal agreement requires approval of the Board's Regional Director. Such an informal agreement was proposed in the instant case by the Board's Field Examiner, but it was rejected by Gulf States.

Neither the Board nor its Regional Director was a party to the stipulation entered into by Gulf States and the union, and neither approved it. The Regional Director approved only the withdrawal of charges under 29 C.F.R. § 101.5.[7]

In cases in which approval is required, the Board or its Regional Director examines the

3. Citing *National Licorice Co. v. NLRB*, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940); *Amalgamated Utility Workers v. Consolidated Edison Co.*, 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738 (1940); *Agwilines, Inc. v. NLRB*, 87 F.2d 146 (5th Cir. 1936).

4. Citing *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778, 803 (5th Cir. 1973).

5. Board authority controlling this particular procedure is found in *John F. Cuneo Co.*, 152 N.L.R.B. 929, 931 n. 4 (1965) as follows:

In its amended answer to the complaint, as amended, Respondent defended, specially, that any allegations that it committed violations of Section 8(a)(1) prior to September 1963 were barred by a "settlement agreement" which resulted in the withdrawal of Section 8(a)(1) charges against it in Case No. 13 -CA–5808 which were filed with the Board by the Union. The Respondent claimed that the withdrawal of these charges by the Union was the *quid pro quo* for its consent to the Union's request for an immediate Board-conducted election. The Trial Examiner granted the General Counsel's motion to strike these provisions of Respondent's answer and Respondent excepts to this ruling. This ruling is affirmed. No settlement agreement was signed or approved by the Regional Director in Case No. 13–CA–5808. In the absence of such approval, any agreement which the Respondent and the Union may have entered into and which resulted in the withdrawal of these prior charges was a private arrangement which does not estop the Board to proceed on any new charges alleging the same conduct as the withdrawn charges. See *Zimnox Coal Company*, 140 NLRB 1229, 1230, 1237, enfd. 336 F.2d 516 (C.A. 6); *Fetzer Television, Inc.*, 129 NLRB 660, 661, 669.

6. In some cases, the Regional Director may determine that an informal, 29 C.F.R. § 101.7 settlement agreement is preferable to a formal one. An agreement reached under these circumstances although provided for by 29 C.F.R. § 101.9(b)(2) need not be approved by the Board and does not require a Board order.

7. Under the language of 29 C.F.R. § 101.5, no approval at all is required for withdrawal of charges. This appears to conflict with 29 C.F.R. § 102.9 which provides, "Any such charge may be withdrawn, prior to the hearing, only with the consent of the regional director with whom such charge was filed; . . ." In this instance the parties incorporated into their private settlement stipulation a specific request for the withdrawal of charges. The Regional Director responded in a letter as follows: "This is to advise that I have approved with Withdrawal Request submitted in the above matter."

merits of the dispute and the appropriateness of the proposed resolution. If the agreement is formal, the Board approves the terms of the agreement itself; even if it is informal, the Regional Director approves its terms. Subject to the exceptions sanctioned by the Supreme Court in *Wallace Corp. v. NLRB*, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1944), the Board's policy is ordinarily not to go behind such a settlement. By contrast the Regional Director's consent for withdrawal of charges does not imply Board participation or approval of the settlement. Under well-established Board procedure withdrawal constitutes a disposition of the issues *without* prejudice,[8] although the parties may have made a contrary private agreement. The majority employs the rule applicable to informal agreements in a situation involving only a withdrawal of charges. The impact of this holding was described in brief by the Board as follows:

> Almost a third of the more than 30,000 charges now filed with the Board annually are disposed of by withdrawals before complaint issues. *Forty-Second Annual Report of the NLRB*, pp. 4–5 (G.P.O., 1977) (S.A. 2–3). If the Board's approval of such withdrawals is to be taken as a determination on the merits or an approval of any private adjustment the parties may have made, the Board's case-handling procedures would be drastically affected and withdrawals discouraged or delayed.

Concluding that there is no distinction between the effect of a withdrawal of charges and the effect of an NLRB approved settlement agreement is incorrect. The four cases cited by the majority[9] do not so hold. In each of those cases the agreement in question was one that had been approved by the Board's Regional Director.

The present situation—a stipulation of the parties with approval of the Regional Director given not to its terms but only to the withdrawal of charges—was presented in *NLRB v. Zimnox Coal Co.*, 336 F.2d 516 (6th Cir. 1964). Under those facts the court held that "it was within the broad discretion of the Regional Director to permit the refiling of these charges." *Id.* at 517. The same result was reached by the Seventh Circuit in *NLRB v. My Store, Inc.*, 345 F.2d 494, 497 (7th Cir.), *cert. denied*, 382 U.S. 927, 86 S.Ct. 315, 15 L.Ed.2d 340 (1965), as follows:

> Respondent contends that the Board could not base findings of 8(a)(1) and (3) violations on evidence of respondent's conduct prior to February 26, 1963, or use such conduct as evidence of respondent's bad faith in bargaining because of the union's "agreement to drop" the original pending unfair labor practice charges and the dismissal of the complaint by the Board's Regional Director. . . . But even assuming, though not deciding, that there was an agreement by the union to drop the charges, the Board could not be precluded from hearing the complaint filed on May 8, 1963. A hearing before the Board is in furtherance of a public policy, not to vindicate a private right, . . . and the "judicial concept of estoppel" may not be invoked to frustrate the purposes of the Act.

*See also NLRB v. Rose*, 347 F.2d 498 (7th Cir. 1965).

The majority emphasizes that the Regional Director "knew that the parties had agreed that each of their withdrawals of charges was with prejudice." It then con-

---

**8.** Section 10120.5 of the National Labor Relations Board's Case Handling Manual, Part 1, April 1975, which is designed only to provide procedural and operational guidance for the agency staff, provides,

> *10120.5 Refiling of Same Allegation*: A closing of a C case pursuant to a withdrawal request constitutes a disposition of the issues *without prejudice*. However, the 10(b) period will apply with respect to any refiling of the same allegations. The matter, if reopened, should be considered and handled as a new charge.

**9.** *NLRB v. Southeastern Stages, Inc.*, 423 F.2d 878, 880 (5th Cir. 1970); *NLRB v. Arrow Specialties, Inc.*, 437 F.2d 522, 526 (8th Cir. 1971); *NLRB v. Bangor Plastics Inc.*, 392 F.2d 772, 775–76 (6th Cir. 1967); *Lincoln Bearing Co. v. NLRB*, 311 F.2d 48, 50 (6th Cir. 1962).

tends that, to implement the policies of the Act, the Regional Director's approval and the parties' settlement agreement should not be set aside "merely because one of the parties has brought new charges." No authority is cited for the suggestion that the terms of the unapproved stipulation of the parties control the power of the Board to go behind the agreement. This conclusion is comparable to a contention that a settlement agreement between private litigants restricts the power of a prosecutor to prosecute.[10] It is manifestly in conflict with § 10(a) of the Act[11] and cannot be reconciled with this court's prior, correct statement in *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778, 803 (5th Cir. 1973), that "parties cannot by contractual agreement divest the Board's function to operate in the public interest."

## II.

The majority then incorrectly applies the rule that would have been applicable had the settlement agreement been one made with approval. Neither the language nor the meaning of *Wallace* is as obscure as is suggested:

> To meet such situations the Board has established as a working rule the principle that it ordinarily will respect the terms of a settlement agreement approved by it. It has consistently gone behind such agreements, however, where subsequent events have demonstrated that efforts at adjustment have failed to accomplish their purpose, or where there has been a subsequent unfair labor practice. We think this rule adopted by the

Board is appropriate to accomplish the Act's purpose with fairness to all concerned. Consequently, since the Board correctly found that there was a subsequent unfair labor practice, it was justified in considering evidence as to petitioner's conduct, both before and after the settlement and certification.

*Wallace Corp. v. NLRB*, 323 U.S. at 254–255, 65 S.Ct. at 241 (footnotes omitted). The cases cited to support this holding, thus given approval by the Supreme Court,[12] provide clear demonstration of the Board's enforcement policy—the same policy to which it continues to adhere.

The majority discounts record evidence with respect to what it designates the first prong of *Wallace*, and proceeds to blunt the second prong beyond recognition. In cases cited in the majority opinion, no such treatment of *Wallace* is found. Thus in *NLRB v. Arrow Specialties, Inc.*, 437 F.2d 522 (8th Cir. 1971), the court said of the pertinent part of *Wallace*,

> This language has been interpreted to mean that a settlement agreement can be set aside and presettlement violations found if there has been a breach of an agreement or a subsequent *independent* violation of the Act by a party to the agreement.

*Id.* at 526 (emphasis added). Almost identical language was used by our own court in *NLRB v. Southeastern Stages, Inc.*, 423 F.2d 878 (5th Cir. 1970) in stating what it correctly characterized as the general rule. *See Lincoln Bearing Co. v. NLRB*, 311 F.2d 48 (6th Cir. 1962); *International Brother-*

---

**10.** The analogy is valid to the extent stated. It cannot be carried further because of obvious differences in the role and procedures used by the Board and a prosecutor.

**11.** 29 U.S.C. § 160(a).

**12.** *Matter of Locomotive Finished Material Company*, supra, 52 N.L.R.B. [922,] 926–928; *Matter of Chicago Casket Company*, 21 N.L.R.B. 235, 252–256; *Matter of Harry A. Halff*, 16 N.L.R.B. 667, 679–682; cf. *Matter of Wickwire Brothers*, supra [16 N.L.R.B. 316, 325, 326]. The courts have approved the Board's practice in this respect. *National Labor Relations Board v. T. W. Phillips Gas*

*& Oil Co.*, 3 Cir., 141 F.2d 304, 305, 306; *National Labor Relations Board v. Hawk & Buck Co.*, 5 Cir., 120 F.2d 903, 904, 905; *National Labor Relations Board v. Thompson Products, Inc.*, 6 Cir., 130 F.2d 363, 366, 367; *Canyon Corp. v. N.L.R.B.*, 8 Cir., 128 F.2d 953, 955, 956; *Sperry Gyroscope Co. v. N.L.R.B.*, 2 Cir., 129 F.2d 922, 931. See *Warehousemen's Union v. N.L.R.B.*, 74 App.D.C. 28, 121 F.2d 84, 92–94, certiorari denied 314 U.S. 674, 62 S.Ct. 138, 86 L.Ed. 539.

*Wallace Corp. v. NLRB*, 323 U.S. 248, 254 n. 10, 65 S.Ct. 238, 241, 89 L.Ed. 216 (1944).

**910**

*hood of Teamsters v. NLRB,* 104 U.S.App. D.C. 359, 262 F.2d 456 (1958). The Board's precedents were correctly summarized in *General Electric Co. v. Johnston,* 235 F.Supp. 898 (W.D.N.C.1964):

> Under the Board's own decisional rules, the unfair labor practice following the settlement must be *substantial* to justify vacating the settlement, and, in determining whether *independent* unfair labor practices have occurred after a settlement, the Board will not appraise a respondent's subsequent conduct in the light of the conduct prior to the settlement.

*Id.* at 900 (emphasis added).

The majority rejects the general rule as thus stated but does not disclose what is to be substituted in its place. It holds that the "mere occurrence of *some*" post settlement unfair labor practice is not enough to go behind the settlement, but it fails to say what is enough. The notion that emerges is that the subsequent unfair labor practice must more or less constitute a violation of the settlement agreement. Broad settlement language customarily employed in Board approved settlements may well require the alleged culprit to go and sin no more. In this event, subsequent, otherwise unrelated, unfair labor practices probably violate both the Act and the settlement agreement. Frequent occurrence of this factual coincidence, however, does not supply support for the treatment of the disjunctive conditions stated in *Wallace* and its progeny as a single condition.

### III.

Under the Board's findings both of the disjunctive *Wallace* tests are met. When the union claimed that Gulf States had failed to bargain in good faith, Gulf States was charged both with committing subsequent unfair labor practices and with violating the heart of the stipulation.[13] The Board found that from the outset Gulf States violated the settlement stipulation provision that "good faith negotiations shall commence." It also found Gulf States guilty of numerous and repeated unfair labor practices, some of which violated the stipulation, and some of which were independent. These findings support the Board's action in going behind the stipulation even under the majority's interpretation of *Wallace.* Viewing the record as we must under *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), there is clearly substantial evidence that supports the Board's order.

I do not find in the Board's briefs a contention that it has unreviewable, unbridled discretion. It correctly makes its usual arguments (1) that Congress entrusted the Board with considerable discretion in carrying forward this nation's quest for labor peace and (2) that it has the responsibility of making credibility judgments and of finding facts. In neither instance does it quarrel with well-established standards of judicial review. In holding that the Board misused its discretion on the basis of the record before us, it seems to me that the majority merely substitutes its own discretion for that of the Board.

### Conclusion

Mistreatment of facts affects these parties only. The unwarranted imposition of a new set of rules governing the withdrawal of charges and post-settlement consideration of presettlement charges, however, works a mischief that goes far beyond this case. The Board points out that because it has not considered itself bound by such action, it has freely consented to the withdrawal of charges. If the rule is to be different, the Board will be obligated to make inquiry into the terms of all private settlements before consenting to the withdrawal of charges. Disposition of the ten thousand plus cases per year that fall into this category will obviously be complicated to an enormous degree.

---

13. The majority's opinion does not clearly indicate the proper procedure to be used by the Board in evaluating these allegations.

The majority's new rule does not have a discernible philosophic tilt. It is a two-edged innovation that can cut either way. Its primary effect is the unwarranted disruption of an already complicated but fairly understandable administrative process.

Before today's decision the line between settlement agreements, both formal and informal, bearing the Board's imprimatur and private, unapproved settlements resulting in withdrawal of charges was sharp and clear. Differences in processing and effect were apparent to parties and practitioners. Applicable regulations, manuals and cases treated them with specificity. The majority's opinion supplants clarity with needless confusion. The end and purpose of this change are not apparent. If the objective is to advance the state of the law, I respectfully submit that it fails. If it is simply to achieve a desired result in this case, it is largely unnecessary. Adopting the panel's mistreatment of the facts insured the result without alteration of controlling law.

I would hold (1) that the private settlement of the parties, pursuant to which the parties withdrew earlier charges, was not binding on the Board; (2) that under Board procedures withdrawal of such charges was without prejudice; and (3) that the Board did not abuse its discretion in entertaining new and timely charges concerning the same conduct. It is doubtful that the factual issue is of en banc importance. Rather than remanding to the panel, however, it is my view that having reached these conclusions we should also acknowledge that substantial evidence supports the Board's findings and enforce its order.